Bonnie MENDELSON, Plaintiff,

v.

DELAWARE RIVER & BAY
AUTHORITY, Defendant,

Delaware River & Bay Authority,
Third–Party Plaintiff,

v.

Saajos Oy, Oy Saajos International,
Ltd., and Pelmatic Knud E. Han-
sen A/S, Third–Party Defendants.

No. Civ.A. 98–90–GMS.

United States District Court,
D. Delaware.

Sept. 1, 2000.

Richard A. Zappa and Timothy J. Houseal of Young, Conaway, Stargatt & Taylor, Wilmington, DE, J. Stephen Simms and W. Charles Bailey, Jr. of Greber & Simms, Baltimore, MD, for Plaintiff and Third–Party Plaintiff Bonnie Mendelson, of counsel.

Bayard J. Snyder of Snyder & Associates, P.A., Wilmington, DE, for Third–Party Defendant Pelmatic Knud E. Hansen A/S.

### MEMORANDUM OPINION

SLEET, District Judge.

## I. INTRODUCTION.

On November 18, 1999, this court held a hearing primarily to determine whether Bonnie Mendelson ("Mendelson") could exercise a third-party right of contribution which the Delaware River and Bay Authority ("DRBA") assigned to her as part of a recent settlement of her direct action. After reviewing the facts of this case in light of the relevant law, the court concludes that the DRBA was actually liable to Mendelson for the injuries which she sustained while onboard one of its vessels (the Twin Capes) and that the settlement between Mendelson and the DRBA is a reasonable one. Therefore, Mendelson may exercise the right of contribution which was assigned to her against third-party defendants Oy Saajos and Saajos Oy International, Ltd. (collectively referred to as "Saajos"). Furthermore, in light of these findings, Mendelson may pursue the right of indemnification which the DRBA assigned to her against third-party defendant Pelmatic Knud E. Hansen ("Hansen") since, given the facts of this case, it was a joint tort-feasor whose negligence contrib-uted to her injuries. Although Hansen claims that the arbitration award which confers this right of indemnification is invalid because the issue presented to the arbitrator was not ripe for decision, this argument has no merit. At the time of the arbitration, Mendelson had already been injured, and the legal dispute between Hansen and the DRBA had crystallized into an actual and definite controversy. It was not an abstract or academic debate on a hypothetical set of facts. Thus, the arbitrator's award is enforceable. The following sections explain the bases for these decisions more thoroughly.

## II. PROCEDURAL HISTORY.

This case arrives before the court in a rather unique posture. In her complaint, Mendelson seeks to recover for personal injuries that she had suffered while onboard a newly refurbished ferry boat, the Twin Capes, owned and operated by the DRBA. At the time that she was injured, Mendelson was attempting to open a pneumatic or hydraulic fire door. Apparently, her hand became trapped in the handle. As the door slid into the wall, Mendelson was pulled along with it.

The DRBA subsequently joined Hansen and Saajos for the purposes of indemnification and contribution, respectively. Hansen served as the architect and design agent on the project which oversaw the refurbishment of the Twin Capes. Saajos manufactured the fire door in question. Both of these companies subsequently moved to dismiss.

Hansen claimed that pursuant to the terms of its contract with the DRBA, any disputes were to be arbitrated. These two parties subsequently agreed to arbitrate their claims, rendering Hansen's motion moot.

Saajos moved to dismiss for lack of personal jurisdiction. The court, however, denied this motion. *See Mendelson v. Delaware River & Bay Auth.*, 56 F.Supp.2d 436, 437 (D.Del.1999). In particular, the

court ruled that because Saajos had designed a custom-made set of fire doors which the company knew were going to be installed in a "Delaware ferr[y]" and because Saajos knew that the handles on these doors were potentially dangerous since other individuals had caught their hands in them, the Finnish company fell within the reach of Delaware's long-arm statute, Del.Code Ann. tit. 10, § 3104 (1998), and subjecting Saajos to personal jurisdiction comported with traditional notions of fair play and substantial justice and, thus, satisfied the requirements of due process. *Id.* at 438–42.

In response, Saajos terminated its relationship with its attorneys and refused to participate in any further proceedings. The court subsequently issued a series of show cause orders which required Saajos to come into compliance with the local rules by obtaining local counsel. After Saajos not only refused to comply with these directives but also failed to appear at the pre-trial conference, the court declared the Finnish company in default on November 4, 1999.

Instead of proceeding to trial against the DRBA, Mendelson decided to settle her case. As part of this settlement, the DRBA agreed to pay Mendelson $430,000 in addition to assigning its rights of indemnification and contribution to her.

Now, Mendelson seeks to exercise these rights. In particular, she asks the court to approve her settlement so that she can pursue the right of contribution against Saajos and the right of indemnification against Hansen.

■ Thus, the court must satisfy itself that the DRBA was actually liable to Mendelson and that the settlement was a reasonable one. *See M & O Marine, Inc. v. Marquette Co.*, 730 F.2d 133, 135–36 (3d Cir.1984) ("[I]n order to secure indemnification, an indemnitee must prove that it was actually liable to the injured party, even if, in the original liability suit, it settled with the injured party rather than

proceed to judgement.") (citing *Frederick v. Hess Oil V.I. Corp.*, 642 F.2d 53, 56 (3d Cir.1981)); *cf. Western Tankers Corp. v. United States*, 387 F.Supp. 487, 492 (S.D.N.Y.1975) ("A shipowner can seek indemnification or contribution from a third-party liable over for breach of warranty where the shipowner has paid to settle a personal injury action ... provided (1) the seaman was injured on the shipowner's vessel, (2) the shipowner was potentially liable to the seaman, and (3) the amount paid in settlement is reasonable.") (citing, *inter alia, Damanti v. A/S Inger*, 314 F.2d 395, 397 (2d Cir.1963)). For this reason, the court held a hearing on November 18, 1999 where it heard evidence from Mendelson herself as well as two of her expert witnesses. The following section sets forth the evidence that was presented at this hearing.

## III. FACTUAL BACKGROUND.

As previously explained, Mendelson claims that she was injured while attempting to open a pneumatic or hydraulic fire door onboard one of the DRBA's ferries, the Twin Capes. This door was specifically designed to be installed in this particular vessel. When a passenger would pull on the door's handle, the hydraulic motor would activate and pull the door sideways into a nearby wall. The evidence introduced at the hearing indicates that the motor exerted approximately 104 pounds of force when opening the door.

According to Mendelson, on the day that she was injured, her hand became caught in the fire door's handle. Thus, as the door slid into the wall, she was pulled along with it. Her hand was subsequently pinned or crushed between the extended handle and the wall. Although Mendelson managed to pull the door away from the wall, she was not able to let go of the handle before the door slide back into the wall. Apparently, as long as she continued to grip the handle, the hydraulic motor would continue to pull the door back into

the wall. Thus, Mendelson's hand was repeatedly slammed into the wall.

Mendelson testified that the pain was excruciating. Although she apparently called for help, some time passed before someone came to her rescue. Eventually, with the help of this DRBA employee, Mendelson was able to free her hand.

### A. Evidence Concerning Liability.

At the hearing, Mendelson introduced the testimony of her engineering expert, Raymond Carlson, Jr., who is a registered professional engineer. Mr. Carlson graduated from the United States Coast Guard Academy with a degree in electrical engineering. After serving six years in the Coast Guard, he enrolled in a graduate program at the Massachusetts Institute of Technology where he earned advanced degrees in naval engineering, naval architecture, and marine engineering. As a naval engineer and architect, Mr. Carlson has extensive experience designing vessels for the Coast Guard. He is familiar with the structural and safety standards which apply to commercial ships. In fact, while Mr. Carlson was in the Coast Guard, he actually reviewed the final plans for the Twin Capes refurbishment. Currently, Mr. Carlson works as a consultant with an private engineering firm which provides advice primarily in insurance and legal matters.[1]

Based on his review of the facts, Mr. Carlson concluded that Mendelson was not responsible for the accident or her injuries because she was only trying to operate the door. In short, Mr. Carlson explained that it was not Mendelson's fault that her hand became stuck in the handle. Instead, Mr. Carlson explained that the DRBA, Saajos, and Hansen bore responsibility for the accident.

For example, in its bid proposal for the fire doors, Saajos indicated that it understood that these doors would be used on the passenger decks of a ferry boat. Saajos also indicated that it was aware that ferries which operated in the waters between Sweden and Norway were required to open by way of push buttons apparently because this method avoided the possibility of a passenger's hand becoming stuck in the handle as the door opened. However, in its six-page bid proposal, Saajos only mentioned this issue in passing. Specifically, Saajos wrote: "All sliding doors have been quoted as 'accommodation doors' as no central locking from the bridge and no push button operation has been required (normally on cardeck doors on ferries between Sweden and Norway)." In other words, Saajos merely noted that the DRBA had not requested that push buttons be installed on the fire doors. It did not explain why these push buttons would be more advantageous than regular handles.

According to Mr. Carlson, Saajos did not act reasonably in this regard. Instead of providing an alternate design and an explanation as to why push buttons should be used, Saajos simply mentioned this issue in one sentence in its six-page price quotation to Hansen. Mr. Carlson testified that the failure to provide an alternate design or to clearly raise the potential problem caused by the use of handles with the DRBA or Hansen violated the duty of care which a reasonable and prudent manufacturer owed to a purchaser of its products.

To its credit, Saajos did eventually recommend to the DRBA and Hansen that safety handles should be used instead of the standard handles that were being contemplated since there "had [been] some accidents with passengers [on other vessels catch]ing their fingers between the handle and the wall." The DRBA and Hansen then proposed some additional changes. For example, they recommended covering the handle "with some

---

1. Based on these qualifications, the court accepted Mr. Carlson as an expert in marine architect and safety in addition to general maritime operations. *See* Fed.R.Evid. 702 (2000).

sort of textured decal so that [a person's] fingers w[ould] not slip when trying to [open] the door." They also suggested placing a diagram on or near the fire door to explain how to properly use the handle.

Saajos, however, rejected these recommendations out of hand, explaining that "there [we]re only two possibilities." Either the safety handles or the standard handles would be used. No other modifications would be made. Because the DRBA did not approve the use of the safety handles as proposed, Saajos stated that it would simply "deliver ... the originally intended" standard handles. According to Mr. Carlson, this "take-it-or-leave-it" response on the part of Saajos was unreasonable. Instead of working with the DRBA and Hansen to address their concerns, Saajos simply rejected their proposed modifications. Mr. Carlson testified that this conduct breached the standard of care that a reasonable and prudent manufacturer owed to an entity like the DRBA.

Mr. Carlson also testified that the failure by Saajos to provide any instructions on the door which explained how to properly use the handle further breached the governing standard of care. According to Mr. Carlson, this standard was further breached by Saajos' failure to post any warnings on the door which informed passengers to exercise caution when opening the door since their hands or fingers could become stuck in the handle.

Mr. Carlson also testified that Hansen breached its duties of care by failing to properly respond to the initial concerns that Saajos expressed about the use of a standard handle. According to Mr. Carlson, as the design agent, Hansen should have discussed the matter with Saajos more thoroughly in order to gain a better understanding of the company's concerns. Mr. Carlson further explained that Hansen should have explored the possibility of installing push buttons on the fire doors instead of declining to pursue the issue. In addition, Mr. Carlson testified that Hansen breached the governing standard of care by failing to address a subsequent request by the DRBA to modify the fire door by cutting a notch in the wall so that a passenger's hand would not be pulled directly into the structure and pinned between the handle and the wall. The DRBA apparently made this request because after the Twin Capes had resumed service, at least seven injuries were documented by ferry staff before Mendelson's accident occurred.

**B.   Evidence Concerning Damages.**

As previously explained, during the hearing, Mendelson testified that the pain which she experienced as her hand was repeatedly wedged between the handle and the wall was excruciating. She likened the experience to feeling like she was a wounded animal caught in a trap struggling to get free. According to Mendelson, each time that her hand was slammed into the wall, she screamed in pain. Mendelson testified that she thought that she was going lose her fingers. Eventually, she was freed with the help of a DRBA employee. According to him, the entire ship was able to hear Mendelson as she screamed for help.

After the accident, Mendelson continued to be in extreme pain. Her hand hurt tremendously and this pain radiated up her arm and into her shoulder. According to Mendelson, she still takes medication for the pain. Given its severity, Mendelson ultimately had to cease working as a sign language interpreter with the United States Senate. As Mendelson testified, the pain simply became too great. She could no longer sign without being brought to the point of tears.

Mendelson's inability to sign has affected her personally as well. She learned to sign as a child because her mother was deaf. Thus, sign language is as natural and comfortable to her as English. However, since the accident, Mendelson has not been able to communicate as effectively with her friends and relatives who are

hearing impaired because she can no longer use their natural language–sign language. Most tragically, after the accident, Mendelson's mother became ill and passed away. Although Mendelson frequently visited her in the hospital, she was not able to fully express all of her feelings in the way that she wanted since she was not able to sign. Recounting these events brought Mendelson to tears.

At the hearing, she also presented testimony from her economics expert, Dr. Andrew Verzilli, who began teaching as a professor of economics at Drexel University in 1966. Dr. Verzilli earned his bachelor's degree from St. Vincent's College. He earned his master's degree and Ph.D. from Boston College. As part of his consulting work, Dr. Verzilli has testified as an economics expert in over 700 cases. He has also published extensively on a wide variety of topics in field of economics.[2]

Dr. Verzilli explained that, when she was injured in 1996, Mendelson earned approximately $40,000 as a sign language interpreter for the U.S. Senate. If Mendelson was still able to sign, her present earning capacity would be slightly more $41,000 per year. Using this figure as a base, Dr. Verzilli then calculated the present value of Mendelson's anticipated future earnings, taking into account various rates of growth and taxes. Specifically, Dr. Verzilli arrived at a range between $511,000 and $595,000. Dr. Verzilli then adjusted this figure downward to account for the possibility that Mendelson might be able to find a part-time job which did not require a

tremendous amount of physical activity but would nevertheless enable her to earn an hourly wage between $6.00 and $7.00. Taking all of these factors into account, Dr. Verzilli concluded to an "extremely high degree of statistical reliability and relevance based on ... Mendelson's age, education, earnings history, [and] background ... in present value terms, minus taxes, the difference in [her] earning capacity ... ranges from $496,000 at the low end to $565,000 at the high end...."

## IV. DISCUSSION.

After considering the evidence presented at the hearing, the court concludes that the DRBA, Saajos, and Hansen are all liable as joint tortfeasors for Mendelson's injury. The court attributes thirty percent of the fault for the accident to Saajos.[3] In light of the injuries sustained by Mendelson, the pain and suffering that she has experienced, and her subsequent lost earnings, the court concludes that her $430,000 settlement with the DRBA is reasonable. As part of this settlement, Mendelson was assigned the DRBA's right of contribution against Saajos. Because the Finnish company has been found to be a joint tortfeasor, Mendelson may seek recovery from Saajos for a proportionate amount of the settlement value. Finally, Mendelson may also enforce the DRBA's right of indemnification which was assigned to her given the validity of the arbitrator's award.

### A. The Settlement Between the DRBA and Mendelson.

As previously explained, as part of her settlement with the DRBA, Mendelson re-

---

**2.** Based on these qualifications, the court accepted Dr. Verzilli as an expert in the area of wage loss and earning capacity. *See* Fed. R.Evid. 702.

**3.** At the hearing, Mendelson argued that, given the nature of the indemnity agreement between the DRBA and Hansen, the court need not reach the issue of apportioning fault among these two defendants for the purposes of this ruling. For this reason, the court has refrained from further allocating the remaining seventy percent of the fault between the DRBA and Hansen.

The court has not attributed any fault to Mendelson because, as Mr. Carlson explained at the hearing, other than trying to open the fire door, Mendelson was not in any way responsible for her injuries. She did not operate the door improperly as she was trying to open it, and she certainly did not intend for her fingers to become stuck in the handle. Furthermore, as Mr. Carlson testified, if the door had been designed or had worked properly, then Mendelson's hand never would have become caught.

ceived the right to pursue contribution and indemnification from Saajos and Hansen respectively. However, before Mendelson can exercise these rights, the court must be satisfied that: (1) she was injured onboard the Twin Capes; (2) the DRBA is actually liable to her for her injuries; and (3) the amount of her settlement with the DRBA is reasonable. *See M & O Marine,* 730 F.2d at 135–36 (3d Cir.1984) ("[I]n order to secure indemnification, an indemnitee must prove that it was actually liable to the injured party, even if, in the original liability suit, it settled with the injured party rather than proceed to judgement.") (citing *Frederick,* 642 F.2d at 56); *see also Western Tankers,* 387 F.Supp. at 492 (S.D.N.Y.1975) ("A shipowner can seek indemnification or contribution from a third-party liable over for breach of warranty where the shipowner has paid to settle a personal injury action . . . provided (1) the seaman was injured on the shipowner's vessel, (2) the shipowner was potentially liable to the seaman, and (3) the amount paid in settlement is reasonable.") (citing, *inter alia, Damanti,* 314 F.2d at 397).

■ In this case, there is no question that Mendelson was actually injured while onboard the Twin Capes. Her hand was repeatedly crushed in one of the vessel's fire doors. In addition, given the evidence introduced at the November 18th hearing, the court has no doubt that the DRBA is actually liable to Mendelson for her injuries.

■ As the United States Supreme Court has explained, "the owner of a ship in navigable waters owes to all who are on board for purposes not inimical to his legitimate interests [*e.g.,* passengers] the duty of exercising reasonable care under the circumstances of each case." *Kermarec v. Compagnie Generale Transatlantique,* 358

U.S. 625, 632, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959); *see also Muratore v. M/S Scotia Prince,* 845 F.2d 347, 353 (1st Cir.1988) (stating that, under maritime law, "a carrier owes a duty of exercising reasonable care towards its passengers under the circumstances") (relying on *Kermarec*); *Gibboney v. Wright,* 517 F.2d 1054, 1059 (5th Cir.1975) (explaining that the defendant "owed a duty to exercise reasonable care to passengers on" his boat); *accord Rainey v. Paquet Cruises, Inc.,* 709 F.2d 169, 172 (2d Cir.1983) (following *Gibboney* ). Under this "reasonable care" standard, the ship owner must exercise a degree of care which is proportionate to the perceived risk. *See Muratore,* 845 F.2d at 353. In other words, the greater the degree of risk to the passenger the greater the amount of care on the part of the ship owner.

The evidence which Mendelson introduced at the hearing demonstrates that the DRBA was informed on several occasions that the standard fire door handle might pose a serious risk to passengers because their hands could become trapped in these handles and subsequently pulled into the wall. Furthermore, even if these warnings were put aside, prior to Mendelson's accident, at least seven other individuals onboard the Twin Capes reported incidents where their hands had become stuck or caught in these fire door handles. Yet, it does not appear as if the DRBA took any steps to address the situation. Thus, it does not seem that the DRBA exercised a degree of care which was proportionate to the obvious and known risk posed by the fire door handles. Because this failure was a direct and proximate cause of the accident, there can be no question that the DRBA is actually liable to Mendelson for her injuries.

The court further finds that Saajos is liable for Mendelson's injuries as well.[4]

---

4. Although the court believes that the entry of default against Saajos resolves any questions about this company's liability, Mendelson did not make this argument during the November 18th hearing. *See Duncan v. Lord,* 409 F.Supp. 687, 692 (E.D.Pa.1976) (explaining that upon the entry of default, "all well-ple[d] allegations of the complaint are considered admitted"); *see also Dynamic Cassette Intern. Ltd. v. Mike Lopez & Assoc., Inc.,* 923 F.Supp. 8, 10 (E.D.N.Y.1996) ("Once a default is entered, a defendant is deemed to have admitted

Although the Finnish company did inform the DRBA and Hansen that the standard fire door handles could · pose a risk to passengers, the manner in which Saajos first raised this concern was not reasonable and, thus, breached the standard of care that a reasonable and prudent manufacturer would owe to its customers. Instead of providing the DRBA or Hansen an alternate design or an explanation as to why push buttons instead of handles should be used, Saajos simply mentioned this issue in passing as part of its original price quotation.

Furthermore, even though Saajos subsequently recommended the use of safety handles, it refused to work with the DRBA and Hansen to incorporate their design suggestions. In fact, Saajos did not even address the potential solutions proposed by the DRBA and Hansen. Instead, it rejected these recommendations out of hand, explaining that "there [we]re only two possibilities." Either the safety handles or the standard handles would be used. No other modifications would be made. Because the DRBA did not approve the use of the safety handles as proposed, Saajos stated that it would simply "deliver ... the originally intended" handles. As Mr. Carlson testified, this "take-it-or-leave-it" response was unreasonable and breached the standard of care that a reasonable and prudent manufacturer owed to an entity like the DRBA.

Finally, Mr. Carlson testified that the failure by Saajos to provide any instructions on the door which informed passengers how to properly use the handle also breached the governing standard of care. According to Mr. Carlson, this standard was further breached given Saajos' failure to post any warnings on the door which informed passengers to exercise caution when opening the door since their hands or fingers could become stuck in the handle.

Because these multiple breaches of the standard of care were a direct and proximate cause of Mendelson's accident, the court concludes that Saajos is also liable for her injuries. As to the percentage of fault attributable to Saajos, the court agrees with Mr. Carlson's conclusion. Given Saajos' conduct, which the court has described at length, the Finnish company is thirty percent responsible for the accident.

With respect to Hansen, Mr. Carlson testified that this company breached its duties of care by failing to properly respond to the initial concerns that Saajos expressed about the use of the standard handles.[5] According to Mr. Carlson, as the design agent, Hansen should have discussed the matter with Saajos more thoroughly in order to gain a better understanding of the company's concerns. Mr. Carlson also explained that Hansen should

---

all of the well-ple[d] allegations in the complaint pertaining to liability."). Instead, she argued that the evidence supports a finding of liability against Saajos.

As the court will explain, the evidence which Mendelson introduced at the hearing does establish that Saajos is liable as a joint tortfeasor. However, the third-party complaint contains allegations of negligence and breach of warranty which are now established by the default entered against Saajos. Therefore, while the court will resolve the issue of Saajos' liability by considering the evidence presented at the hearing, it questions whether this issue had to be addressed in this way.

5. Again, during the November 18th hearing, Mendelson presented evidence to support her claims that, like Saajos, Hansen was also a joint tortfeasor who should be held liable for her injuries. However, as the court will discuss, the issue of Hansen's third-party liability was submitted to an arbitrator, who ruled that the DRBA was entitled to indemnification.

Although Mendelson did not advance this argument at the hearing, the court believes that the arbitrator's ruling resolves any questions concerning Hansen's liability (especially since Mendelson has moved to enforce this award). Nevertheless, the court will consider whether the evidence supports a finding of liability against Hansen since this is the argument which Mendelson presented at the hearing.

have explored the possibility of installing push buttons on the fire doors instead of declining to pursue the issue. Mr. Carlson further testified that Hansen breached the governing standard of care by failing to address a subsequent request by the DRBA to modify the fire door by cutting a notch in the wall so that a passenger's hand would not be pulled directly into the structure and pinned between the handle and the wall. Based on this evidence, the court finds that Hansen is also liable for Mendelson's injuries since its conduct was a direct and proximate cause of her injuries.

Turning to the final element of the *Western Tankers* test, whether the $430,000 settlement between the DRBA and Mendelson is reasonable, this amount seems reasonable based on Mendelson's lost earnings capacity alone. As mentioned earlier, Dr. Verzilli concluded to an "extremely high degree of statistical reliability and relevance based on ... Mendelson's age, education, earnings history, [and] background ... in present value terms, minus taxes, the difference in [her] earning capacity ... ranges from $496,000 at the low end to $565,000 at the high end...." When the court also takes into account the extreme pain that Mendelson experienced during the accident, the ongoing pain that she continues to suffer, and the impact that her inability to sign has subsequently had on her life, the $430,000 settlement amount seems more than reasonable.

### B. Mendelson's Right of Contribution from Saajos.

Because the court has found that Saajos is a joint tortfeasor that is thirty percent at fault for Mendelson's injuries, the Finnish company is responsible for a proportionate amount of the settlement value. *See Nationwide Mut. Ins. Co. v. Philadelphia Elec. Co.*, 443 F.Supp. 1140, 1143 (E.D.Pa.1977) (explaining that one of the joint tortfeasors must have discharged the common liability through settlement, paid more than its *pro rata* share in the process, and extinguished the liability of the other tortfeasor); *see also W.D. Rubright v. International Harvester Co.*, 358 F.Supp. 1388, 1392 (W.D.Pa.1973) (noting that the settlement must also be reasonable) (cited in *Nationwide*). The court will enter a judgment to this effect in favor of Mendelson in a separate order.

### C. The Enforceability of the Arbitration Award against Hansen.

Finally, Mendelson has moved to enforce an arbitration award which the DRBA obtained against Hansen. As previously discussed, after Mendelson filed suit, the DRBA brought a third-party action against Hansen for the purposes of indemnification. Hansen then moved to dismiss the third-party proceeding on the grounds that the DRBA had agreed to arbitrate any claims it had against Hansen stemming from its activities as the design agent for the Twin Capes refurbishment.

> Specifically, Hansen asked the court to dismiss th[e] action in favor of arbitration pursuant to the design services agreement executed by and between the parties. The issues raised in the third-party complaint arise under the contract. The contract mandates [the] arbitration of all disputes between the parties.

Hansen then quoted the specific language of the "Dispute Resolution" clause in the contract. In relevant part, this provision states that:

> All claims, disputes and other matters in dispute between [the] DRBA and [Hansen] arising out of or in any way relating to this [a]greement or the performance or breach thereof ... shall be subject to exclusive and final and binding resolution.... This [a]greement for dispute resolution is intended as a binding agreement to arbitrate ... with the Executive Director of the Owner [the DRBA] as arbitrator and referee ... and shall be specifically enforceable.

Any award rendered in any such dispute resolution procedure shall be final and judgment may be entered upon it by a court of competent jurisdiction in accordance with applicable law.

Based on the language of this clause, Hansen argued that its agreement with the DRBA "provides that all disputes between the [two parties] must be submitted to arbitration." Instead of filing an opposition to this motion, the DRBA consented to arbitration. The court then stayed the third-party action "pending arbitration of the dispute between the [DRBA] and Hansen pursuant to the written agreement" between the two parties.

Although an arbitration hearing was scheduled for May 12, 1999, Hansen refused to attend. Apparently, the company was objecting to the arbitrator since this individual was the DRBA's executive director. It seems that Hansen was concerned that, as an employee of the DRBA, the arbitrator would not be impartial.

The arbitrator rejected this argument on the grounds that Hansen had "knowingly and voluntarily waived any such objection by moving to dismiss the DRBA's third-party complaint in favor of arbitration pursuant to the Design Services Agreement." The arbitrator further concluded that:

> Pursuant to Paragraph 8.1 of the February 24, 1995 Design Services Agreement, Hansen is obligated to indemnify and hold the DRBA harmless from and against any and all damages, losses, expenses and other costs including, without limitation, attorney's fees, expert fees and court costs which the DRBA has incurred to date and will incur in the future by reason of the action pending in the United States District Court for the District of Delaware entitled *Bonnie Mendelson v. The Delaware River & Bay Authority*, C[ase] No. 98–90–GMS. Those indemnified costs shall include the DRBA's attorney's fees incurred in connection with the arbitration proceeding.

■ Mendelson has now sought to enforce this award. Hansen has opposed this request, contending that the DRBA attempted to arbitrate a matter that was not ripe for decision. Although Mendelson claims that Hansen waived its right to raise this argument since it did not assert it below, the court notes that issues of subject matter jurisdiction, which include whether an action presents a justiciable case or controversy that is ripe for decision, cannot be waived. They can be raised at any time by any party or, for that matter, by the court *sua sponte. See Bigelow v. Michigan Dep't of Natural Resources*, 970 F.2d 154, 157 (6th Cir.1992) ("Ripeness is more than a mere procedural question; it is determinative of jurisdiction. If a claim is unripe, federal courts lack subject matter jurisdiction and the complaint must be dismissed. This deficiency may be raised sua sponte if not raised by the parties.") (quoting *Southern Pac. Transp. Co. v. City of Los Angeles*, 922 F.2d 498, 502 (9th Cir.1990); *Celentano v. City of West Haven*, 815 F.Supp. 561, 565 n. 1 (D.Conn.1993)) ("It is settled law that ripeness is a jurisdictional prerequisite to the adjudication of a claim in federal court. A district court is free to evaluate whether a claim is jurisdictionally defective at any time during the course of litigation. Litigants, moreover, cannot waive subject matter jurisdiction by express consent, conduct, or estoppel.") (citations omitted). Therefore, the court will consider Hansen's argument.

■ In essence, Hansen contends that its dispute with the DRBA should not have been arbitrated in May of 1999 because, at that time, it was not clear whether Mendelson would actually recover against the DRBA. In addition, Hansen continues, even if it was certain that Mendelson was going to recover against the DRBA, it was not clear whether Hansen had been negligent in performing any of the services specified in the design services agreement, which would give rise to a contractual right of indemnification. In support of

these arguments, Hansen points out that the DRBA's own third-party complaint alleged that Hansen "is liable to the DRBA and must pay for damages and costs awarded against [the] DRBA in the event that [Mendelson] prevails on her claim against [the] DRBA." Because Mendelson had not yet prevailed on her claim against the DRBA at the time of the arbitration, Hansen contends, the matter was not ripe for adjudication.

The court is not persuaded by this argument. Viewing the arbitrator's award as a declaration of the rights and obligation of the parties, the court has no doubt that there was sufficient adversity between the DRBA and Hansen to present a justiciable case or controversy which was ripe for decision.

Normally, when "the essential facts establishing a right to relief ... have already occurred, the case is justiciable." See Riehl v. Travelers Ins. Co., 772 F.2d 19, 22 (3d Cir.1985); cf. Hoechst Celanese Corp. v. National Union Fire Ins. Co., 623 A.2d 1133, 1137 (Del.Super.Ct.1992) ("A litigant need not have suffered actual harm, but an actual controversy must exist so that judicial resources are not wasted on hypothetical disputes or on situations in which a judicial declaration will not end the dispute between the parties."). As the Riehl court explained, even though a court may have yet to enter a judgment which clearly establishes liability, such a final ruling is not necessary to establish a justiciable case or controversy. 772 F.2d at 22–23; see also ACandS, Inc. v. Aetna Cas. & Surety Co., 666 F.2d 819, 823 (3d Cir.1981) ("Declaratory suits to determine the scope of insurance coverage have often been brought independently of the underlying claims, albeit the exact sums to which the insurer may be liable to indemnify depend upon the outcome of the underlying suits.").

Like most insurance contracts, the agreement between the DRBA and Hansen contained an indemnification clause. As the Third Circuit has explained, an "indemnification agreement carries with it not only an obligation to pay judgments ... but also, in the real world, to pay settlement amounts." See ACandS, 666 F.2d at 823. For this reason, "absolute proof that a[ ] polic[y] will be triggered is by no means required in order to establish a ripe controversy." See Hoechst Celanese, 623 A.2d at 1137. In fact, because "delay for the sake of more concrete development ... prevent[s] the litigants from shaping a settlement strategy and thereby avoiding unnecessary costs," the Third Circuit has generally held that claims for declaratory relief are ripe when a ruling would enable a party which is not certain of its rights to avoid the accrual of further damages. See ACandS, 666 F.2d at 823.

Like the situations in Riehl and ACandS, all of the relevant events had already occurred at the time that the DRBA moved for arbitration. See Riehl, 772 F.2d at 22–23 (explaining that the waste had already been dumped and the chemicals had already leached off the property); ACandS, 666 F.2d at 822 ("[T]he harm has already occurred, and the defendant has acted."). Most obviously, Mendelson had already been injured. Thus, the dispute between the DRBA and Hansen was real and concrete. The parties were not trying to resolve a hypothetical question of indemnification based on an assumption that someone might be injured by one of the fire doors onboard the Twin Capes at some unspecified point in time in the future. See, e.g., Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240–41, 57 S.Ct. 461, 81 L.Ed. 617 (1937) ("A justiciable controversy is ... distinguish[able] from a difference or a dispute of a hypothetical or abstract character.... It must be a real and substantial controversy ... as distinguished from an opinion advising what the law would be upon a hypothetical state of facts."); see also Monsanto Co. v. Aetna Cas. & Surety Co., 565 A.2d 268, 275 (Del.Super.Ct.1989) ("[T]he [c]ourt must be sure that it does not construct hypothetical factual situations on which it makes a finding, putting forth an advisory

opinion."). Since Mendelson had already been injured and the parties were fully aware of the facts surrounding her accident,[6] there was an actual, concrete, and definite controversy between the DRBA and Hansen which required resolution. Furthermore, since the DRBA was attempting to assert its right of indemnification against Hansen, the two parties had adverse legal interests at the time of the arbitration. *See ACandS*, 666 F.2d at 822 (noting the requirement); *accord 'Hoechst Celanese*, 623 A.2d at 1136–37 (explaining that the parties must have real and adverse interests). Thus, Hansen's claim that its dispute with the DRBA was not ripe for decision is unavailing.

■ Citing *Commonwealth Coatings Corp. v. Continental Cas. Co.*, Hansen next argues that the arbitration award is invalid because the arbitrator was not impartial given his employment with the DRBA. 393 U.S. 145, 150, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968) ("We cannot believe that it was the purpose of Congress to authorize litigants to submit their cases and controversies to arbitration boards that might be reasonably thought biased against one litigant and favorable to another."). However, as Hansen admits, the arbitrator in *Commercial Coatings* "had an undisclosed business relationship with one of the parties." *Id.* at 149, 89 S.Ct. 337.

Here, Hansen knew that the arbitration would occur before the executive director of the DRBA. These terms were expressly included in the contract. Hansen, a sophisticated party who was represented by counsel during the negotiations leading up to the final agreement, was fully aware of this language when it entered into the agreement. Hansen even quoted the terms of this clause verbatim when it moved to dismiss the DRBA's third-party complaint in favor of arbitration. For these reasons, the court will not allow Hansen to renege on this part of its bargain. *See Ruckman & Hansen, Inc. v. Delaware River and Bay Auth.*, 244 A.2d 277, 278 (Del.1968) ("It has long been the law of Delaware that when parties to a contract agree to submit differences arising under that contract to an arbitrator, his decision, in the absence of fraud, is final and will not be re-examined by a court.").[7]

Finally, because it did not appear before the arbitrator, Hansen claims that the arbitration award is effectively a default judgment. Noting the longstanding judicial aversion toward resolving matters through the entry of a default judgment, Hansen asks for the arbitrator's award to

6. Although Hansen now claims that the matter was not ripe for arbitration because "discovery ... had not been substantially completed," this argument has no merit. The ripeness of a case for adjudication does not depend upon the amount of discovery that has been completed. It depends upon the nature of the events which have occurred. *See Riehl*, 772 F.2d at 22 ("Where ... the essential facts establishing a right to relief ... have already occurred, the case is justiciable.").

Furthermore, the only argument which Hansen made before the arbitrator on the issue of ripeness was that "[t]he arbitration ... [should] not occur until after the underlying [action has been] resolved" since "the extent of the damages [incurred] by [the] DRBA ... will not be known until the ... case [has been] either settled or tried to a final judgment." However, as the Third Circuit explained in both *Riehl* and *ACandS*, the

entry of a final judgment which establishes liability or specifies the amount of damages owed is not a prerequisite for establishing a justiciable case or controversy. *See Riehl*, 772 F.2d at 22; *ACandS*, 666 F.2d at 823.

7. The precedential value of the Delaware Supreme Court's decision in *Ruckman & Hansen* cannot be overemphasized. There, in resolving a dispute between the DRBA and one of its contractors, an arbitrator (who also happened to be the director of the DRBA) issued a final award in favor of the Authority. 244 A.2d at 277. Because the identity of this individual had been disclosed to and agreed upon by the contractor, the Delaware Supreme Court concluded that no fraud or unfairness had occurred. *Id.* at 278. Therefore, the arbitrator's award was enforceable (even though the arbitrator himself worked for the DRBA). *Id.* The exact same situation is presented in this case.

be set aside. This argument is also devoid of merit. Hansen moved to compel the arbitration of its dispute with the DRBA. It further submitted materials to the arbitrator prior to the hearing. Then, on the day of the proceedings, it deliberately refused to appear. While the company could have attended the hearing and raised any defenses or arguments which it deemed appropriate, it declined to do so. Instead, it voluntarily absented itself from the process, electing to litigate the enforceability of the award before this court. Given this posture, the court concludes that it would be inequitable to accede to Hansen's request. At a minimum, the company has failed to cite any reason which would normally warrant relief from judgment. Cf. Fed.R.Civ.P. 60(b) (2000) (listing fraud, mistake, inadvertence, surprise, excusable neglect, and newly discovered evidence as the main reasons for granting relief from judgment).

For all of these reasons, the arbitration award obtained by the DRBA against Hansen is valid and enforceable. The court will enter judgment on this award in a separate order.

## V. CONCLUSION.

After considering the evidence presented at the November 18, 1999 hearing, the court concludes that the DRBA, Saajos, and Hansen are all liable for Mendelson's injuries as joint tortfeasors. The court further concludes that Saajos is thirty percent at fault for the accident. Because Saajos is a joint tort feasor, the DRBA has a right of contribution against the Finnish company. Since this right has been assigned to Mendelson, she can recover a proportionate share of the settlement cost. Finally, Mendelson can enforce the DRBA's right of indemnification against Hansen since this right has also been assigned to her.

Although Hansen claims that its dispute with the DRBA was not ripe for adjudication, this argument has no merit. At the time that the arbitration occurred, Mendel-

son had already been injured. Thus, the dispute between the DRBA and Hansen was actual, definite, and concrete. It was not in any way hypothetical or abstract. Furthermore, given their respective positions on the issue of indemnification, the DRBA and Hansen had adverse legal interests. Therefore, the dispute between them was ripe for adjudication. While Hansen contends that the arbitrator who issued the award was biased since he was employed by the DRBA, the company expressly agreed to have this individual arbitrate any disputes that arose out of the design services agreement. Hansen was fully aware of this contractual provision when it moved to compel arbitration. As a result, Hansen cannot legitimately claim fraud or unfair surprise. Furthermore, by agreeing to the language of the arbitration clause and subsequently moving to compel arbitration pursuant to this clause, Hansen waived any right it may have had to challenge the impartiality of the arbitrator. Finally, by voluntarily absenting itself from the arbitration process, Hansen cannot legitimately contend that any default entered against it by the arbitrator should be set aside. Therefore, its arguments concerning the unenforceability of the arbitration award are unavailing.