**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

RUMMEL KLEPPER & KAHL, LLP,   )
                                   )
          Plaintiff,          )
                                   )
         v.               )   C.A. No. 2020-0458-PAF
                                   )
DELAWARE RIVER AND BAY      )
AUTHORITY,                  )
                                   )
          Defendant.      )
                                   )

**MEMORANDUM OPINION**

Date Submitted: September 27, 2021
Date Decided: January 3, 2022

Patrick M. McGrory, TIGHE & CONTRELL, P.A., Wilmington, Delaware; *Attorneys for Plaintiff.*

Donna L. Culver, MORRIS, NICHOLS, ARSHT & TUNNEL LLP, Wilmington, Delaware; Richard W. Hunt and Ashley H. Buono, PARKER MCCAY P.A., Mt. Laurel, New Jersey, *Attorneys for Defendant.*

**FIORAVANTI, Vice Chancellor**

In November 2010, the Delaware River and Bay Authority (the "DRBA") engaged Rummel Klepper & Kahl, LLP ("RK&K") to perform professional engineering design services for a reconstruction project for the Delaware Memorial Bridge. The parties' agreement contains a dispute resolution procedure that governs "[a]ll claims, disputes and other matters in question . . . arising out of or in any way relating to" the agreement. If the parties are not able to resolve any dispute, it is "subject to exclusive, final and binding resolution" under the DRBA's then-current dispute resolution procedures. The agreement provides that the DRBA's Executive Director will serve as "referee in all questions arising under the terms of the Contract . . . and the decision of the Director shall be final and binding." The agreement states that the dispute resolution procedure "is intended as a binding agreement to arbitrate under the Delaware Uniform Arbitration Act."

In November 2019, the DRBA sent a "Notice of Default" to RK&K alleging it had committed errors and omissions in performing its services under the agreement. The Notice of Default indicated the DRBA's intent to commence the dispute resolution process under the agreement. After the parties failed to resolve their disagreement, the DRBA sent a "Notice of Intent to Arbitrate" to RK&K's counsel. RK&K then filed this action to enjoin arbitration. RK&K contends the arbitration provision is unenforceable and that the DRBA's claims are either outside the scope of the agreement or otherwise time-barred. The DRBA has moved to

dismiss the complaint and to compel arbitration.[1]  This opinion resolves that motion

and grants the DRBA's motion to compel arbitration and to dismiss the action.

## I.   BACKGROUND

Unless otherwise specified, the following facts are taken from RK&K's

Verified Complaint (the "Complaint" or "Compl."), documents integral thereto, and

documents submitted in connection with the motion to dismiss for lack of subject

matter jurisdiction.

### A.   The Parties

Plaintiff RK&K is a Maryland limited liability partnership that provides

professional engineering design and construction consulting services. [2]

Defendant DRBA is a body politic and bistate agency formed on October 2,

1962 resulting from a compact between the State of Delaware and the State of New

Jersey.[3]  The DRBA owns, operates, and maintains the Delaware Memorial Bridge.[4]

### B.   The Project and the Agreement

In February 2010, the DRBA assembled a request for proposal ("RFP"),

seeking "on-call" engineering design and construction phase services for Phase IV

---

[1] The DRBA's Opening Brief is cited as "Def.'s Opening Br."; RK&K's Answering Brief is cited as "Pl.'s Ans. Br."; the DRBA's Reply Brief is cited as "Def.'s Reply Br."; the parties' supplemental submissions are cited as "Def.'s Supp. Br." and "Pl.'s Supp. Br."

[2] Dkt. 1 ("Compl.") ¶ 1 & Ex. A ("Agreement") at AGR-1

[3] Compl. ¶ 2.

[4] Agreement at AGR-1.

of its project for reconstruction of the I-295 southbound approach roads to the Delaware Memorial Bridge (the "Project").[5] The RFP stated an anticipated final design completion date of September 2011 and construction period of March 2012 to May 2014.[6] The RFP included related proposed contract documents. RK&K responded to the RFP, and the parties entered into a Consulting Services Agreement, dated November 15, 2010 (the "Agreement").

Article 2 of the Agreement stated that compensation for RK&K's services was not to exceed $2,100,000, including renewals and extensions, unless approved in writing by the DRBA prior to performance of the services.[7] Article 4 specified that the Agreement would expire five years from the date of execution unless the DRBA terminated or extended the Agreement "by formal written amendment executed on behalf of the DRBA by the Executive Director or his designee and by an authorized representative of the Consultant."[8] Accordingly, the Agreement, by these terms, would expire on November 15, 2015, unless otherwise amended.

---

[5] Compl. ¶ 7; Dkt. 15, Affidavit of Melinda B. Peters, P.E. attached as Exhibit 1 to Pl.'s Ans. Br. ("Peters Aff."), Ex. F ("Request for Proposal").

[6] Compl. ¶ 9; Request for Proposal § 1.2.

[7] Agreement, art. II.

[8] *Id.*, art. IV ("Should the DBA require an extension of time to maintain consulting coverage while it publicly advertises and awards a subsequent contract, the DRBA reserves the right to extend this agreement on a month to month basis. The option to renew and/or extend this agreement rests solely with the DRBA. Any modification or extension shall be by formal written amendment executed on behalf of the DRBA by the Executive Director or his designee and by an authorized representative of the Consultant.").

Article 12(a) of the Agreement contained a "Dispute Resolution Procedure" which incorporated the DBRA's Standard Specifications for Road and Bridge Construction (January 1981 edition, as amended through the date of the Agreement) (the "Dispute Resolution Provision").[9] Article 14(n) of the Agreement contained a survival clause, stating that "the obligation of [RK&K] to follow the dispute resolution procedures set forth in Section 12(a) shall remain fully enforceable following termination."[10]

## C. RK&K and the DRBA Broaden the Scope of RK&K's Services

On several occasions during the term of the Agreement, the parties modified the scope of both RK&K's services and fees under the Agreement. These modifications were documented through letters and purchase orders expressly linked to the Agreement using the DRBA's contract number, CS-09-03, which is also reflected on the cover page of the Agreement.[11] On January 31, 2013, Gregory Pawlowski, a DRBA Project Engineer, wrote to Michael Krupsaw, RK&K's Project Engineer, to "modify the [GEC Agreement No. CS-09-03] to include the following scope of work," and included a list of three additional services that RK&K would

---

[9] *Id.*, art. XII § a.

[10] *Id.*, art. XIV § n.

[11] *Id.*

provide on the Project.[12]   On March 6, 2013, Pawlowski sent another letter to Krupsaw to approve RK&K's request for additional consulting fees, thus revising the budget of the Agreement.[13]   In this letter, the DRBA referenced the Agreement and expressly linked the correlating purchase order to the Agreement.[14]   On July 2, 2015, Krupsaw, on behalf of RK&K, sent a letter to Pawlowski "requesting the approval of the Delaware River and Bay Authority of [RK&K's] scope and fee proposal to provide additional engineering services related to [the Project]."[15]   This letter from RK&K also directly referenced the Agreement by Contract No. CS-09-03.[16]   In a letter dated August 12, 2015, the DRBA approved RK&K's proposal to extend the scope of the Agreement.[17]

Ultimately, the project was significantly delayed, such that it did not achieve substantial completion until about five years after the anticipated completion date stated in the RFP.[18]   According to RK&K, the initial maximum compensation

---

[12] Dkt. 18, Declaration of David Hoppenjans in support of Def.'s Reply Br. ("Hoppenjans Decl."), Ex. A (Jan. 31, 2013 DRBA Letter to RK&K).

[13] *Id.*, Ex. B (Mar. 6, 2013 DRBA Letter to RK&K).

[14] *Id.* ("This letter is in reference to GEC Agreement No. CS-0903 – I-295 Southbound Approach Roads Professional Engineering Design and Construction Phase Services, Delaware Memorial Bridge.") ("[W]e will issue a separate purchase order in the amount of $301,587.24 which will also be linked to this contract.").

[15] *Id.*, Ex. C (Jul. 2, 2015 RK&K Letter to the DRBA).

[16] *Id.*

[17] *Id.*, Ex. D (Aug. 12, 2015 DRBA Letter to RK&K).

[18] Compl. ¶ 26.

amount pursuant to the original scope of the Agreement had been paid to RK&K by the end of 2013.[19] RK&K admits, however, the DRBA's last payment to RK&K for services tied to the Project was on or around March 22, 2017,[20] which is also reflected in the DRBA's records.[21] RK&K's invoices also reflect it was billing for services performed between the time it claims to have been paid in full under the Agreement and before the Agreement's stated expiration date of November 15, 2015.[22] The invoices also reflect that RK&K was billing for services after November 2015.[23] RK&K's invoices all referenced the Agreement by contract number CS-09-03. Indeed, RK&K admits that it continued to provide services to the DRBA into 2020.[24]

## D. The DRBA Initiates the Dispute Resolution Procedure

On November 15, 2019, the DRBA sent a "Notice of Default" to RK&K alleging errors and omissions in RK&K's performance of its services under the

---

[19] *Id.* ¶ 24.

[20] Dkt. 15, Pl.'s Ans. Br. 5, 16.

[21] Dkt. 18, Hoppenjans Decl., Ex. E.

[22] *See, e.g.*, Dkt. 15, Peters Aff., Ex. C at 131 (March 7, 2014 invoice for $49,092.50 referencing "DRBA Phase IV Design" and "GEC Agreement No. CS-09-03"); *id*. Ex. D at 159 (Jan. 5, 2016 invoice for period Nov. 14 to Dec. 15, 2015 for $1,107.18 referencing "DRBA Phase IV Design" and "GEC Agreement No. CS-09-03").

[23] *See, e.g.*, Dkt. 15, Peters Aff., Ex. E at 169 (Oct. 11, 2016 invoice for $87,994.16 referencing "DRBA Phase IV" and "Contract No. CS-09-03"); *id*. at 175 (March 17, 2017 invoice for $16,719.60 referencing "DRBA Phase IV" and "Contract No. CS-09-03").

[24] *Id.* at 5, 16–17.

Agreement. The Notice of Default indicated the DRBA's intent to commence the dispute resolution process under the terms of the Agreement.[25] The DRBA's Notice of Default included a "Draft Expert Report" prepared by a consulting firm which detailed RK&K's alleged errors and omissions.[26] Counsel for RK&K acknowledged the Notice of Default and agreed to participate in good faith negotiations.[27] RK&K's counsel also noted that RK&K "has continued working out of scope to address these and other matters for a considerable amount of time" and had an unpaid balance of over $400,000, "which will need to be part of the negotiations."[28] On February 26, 2020, the parties met to attempt to resolve the dispute, but were unsuccessful.[29]

On May 15, 2020, the DRBA sent a Notice of Intent to Arbitrate by both regular mail and certified mail (return receipt requested) to RK&K's Delaware counsel, referencing the "aforementioned breaches of the contract outlined and discussed in [the Notice of Default]" as the claims it was seeking to arbitrate.[30] The Notice of Intent to Arbitrate specified that the DRBA intended to commence

---

[25] Dkt. 10, Declaration of Barnaby Grzaslewicz in support of Def.'s Opening Br. ("Grzaslewicz Decl."), Ex. A ("Notice of Default").

[26] *Id.*; Compl. ¶ 30.

[27] Grzaslewicz Decl., Ex. B (Letter from RK&K's counsel to the DRBA's counsel).

[28] *Id.*

[29] Compl. ¶ 31.

[30] *Id.*, Ex. C ("Notice of Intent to Arbitrate").

arbitration with the Executive Director of the DRBA serving as the arbitrator.[31] RK&K's counsel responded by email stating: "Service on me of a demand is not good enough."[32]

## E. Procedural History

On June 11, 2020, RK&K filed its Complaint seeking to enjoin arbitration. The Complaint contests the DRBA's invocation of the arbitration process, the enforceability of the arbitration clause itself, and the timeliness of the underlying claims.[33] On July 31, 2020, the DRBA moved to compel arbitration and to dismiss, or, in the alternative, stay the claims asserted in the Complaint pending arbitration.[34] After the parties engaged in an unsuccessful attempt at mediation, the court heard oral argument on the DRBA's motion on September 13, 2021 and requested supplemental briefing from the parties.[35] The court took the matter under submission on September 28, 2021.

---

[31] *Id*. at 2.

[32] Dkt. 15, Pl.'s Ans. Br. Ex. 3 (E-mail from RK&K's counsel to the DRBA's counsel).

[33] Compl.

[34] Dkt. 5.

[35] Dkt. 24.

## II. ANALYSIS

The DRBA seeks dismissal of RK&K's claims in favor of arbitration pursuant to the Agreement's Dispute Resolution Provision.[36] "A motion to dismiss based on an arbitration clause goes to the court's subject matter jurisdiction over a dispute and is properly reviewed under Court of Chancery Rule 12(b)(1)." *Legend Natural Gas II Hldgs., LP v. Hargis*, 2012 WL 4481303, at \*4 (Del. Ch. Sept. 28, 2012) (citing *Ishimaru v. Fung*, 2005 WL 2899680, at \*13 (Del. Ch. Oct. 26, 2005), and *Acierno v. New Castle Cty.*, 2006 WL 1668370, at \*1 n.8 (Del. Ch. June 8, 2006)). Unlike standards governing a motion to dismiss under Court of Chancery Rule 12(b)(6), "the guidelines for the Court's review of [a] Rule 12(b)(1) motion are far more demanding of the non-movant. The burden is on the Plaintiff[] to prove that jurisdiction exists." *Appriva S'holder Litig. Co., LLC v. Ev3, Inc.*, 937 A.2d 1275, 1284 n.14 (Del. 2007) (citation and internal quotations omitted). "In deciding a 12(b)(1) motion to dismiss for want of subject matter jurisdiction, the court may consider documents outside the complaint." *Legend Natural Gas*, 2012 WL 4481303, at \*4 n.25 (citing *Acierno*, 2006 WL 1668370, at \*1 n.8). "A strong presumption exists in favor of arbitration, and, accordingly, contractual arbitration clauses are generally interpreted broadly by the courts. However, this presumption

---

[36] Dkt. 10, Def.'s Opening Br. 1.

will not trump basic principles of contract interpretation." *NAMA Hldgs., LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 430 (Del. Ch. 2007).

Delaware courts lack jurisdiction to resolve disputes that litigants have contractually agreed to arbitrate. *Id.* at 429. "[A] motion to dismiss for lack of subject matter jurisdiction will be granted if the 'dispute is one that, on its face, falls within the arbitration clause of the contract.'" *Id.* Thus, the court's analysis begins with the text of the contract. The Dispute Resolution Provision in the Agreement provides:

> 12. **Claims; Limitations of Actions:**
> (a)    Dispute Resolution Procedure.  All claims, disputes and other matters in question between the DRBA and the Consultant, arising out of or in any way relating to this Agreement or the performance or breach thereof that are not resolved by good faith negotiation between the parties within sixty (60) days after the same shall first be advised by one party to the other, shall be subject to exclusive, final and binding resolution pursuant to the dispute resolution procedures set forth in Section 1.5.1 of the DRBA Standard Specifications for Road and Bridge Construction (January 1981 edition, as amended through the date of this Agreement) (the "Specifications"), which provides as follows:
>
> > The Director shall act as referee in all questions arising under the terms of the Contract between the parties hereto, and the decision of the Director shall be final and binding.
>
> This Agreement for dispute resolution is intended as a binding agreement to arbitrate under the Delaware Uniform Arbitration Act, 10 Del. C. §§ 5701 *et seq.* (with the Executive Director of the DRBA as arbitrator and referee in accordance with Section 1.5.1 of the Specifications) and shall be specifically enforceable.  Any award rendered in any such dispute resolution procedure shall be final and judgment may be entered upon it by a court of competent jurisdiction

10

in accordance with applicable law. Notwithstanding the foregoing, the DRBA may apply to any court having jurisdiction hereof to seek injunctive relief until the arbitration award is rendered or the controversy is otherwise resolved.[37]

Article 8 of the Agreement states: "the DRBA shall be entitled as a matter of right to injunctive relief in any court of competent jurisdiction . . . ." The Agreement does not confer a corresponding right to injunctive relief upon RK&K. The Dispute Resolution Provision expressly provides, and the parties agree, that it is governed by the Delaware Uniform Arbitration Act ("DUAA"). *See* 10 *Del. C.* § 5702(a). ("The making of an agreement described in § 5701 . . . specifically referencing the [DUAA] and the parties' desire to have it apply to their agreement confers jurisdiction on the Court [of Chancery] to enforce the agreement under this chapter . . . .").

## A. Arbitrability Issues Under the Agreement

RK&K has asserted a variety of arguments to avoid arbitrating the DRBA's claims. They are briefly outlined as follows: (i) there is no binding agreement to arbitrate the claims that the DRBA is asserting; (ii) most, if not all, of the claims are time-barred, either under the applicable statute of limitations or under 10 *Del. C.* § 8127 (the "Statute of Repose"); (iii) the arbitration provision is unenforceable due to unconscionability because it provides for the DRBA Executive Director to serve as the arbitrator; (iv) the DRBA lacks authority to act as a tribunal; and (v) the

---

[37] Agreement, art. XII § a.

11

demand for arbitration was not properly served and, thus, the demand fails for lack of notice.[38]  In moving to dismiss, the DRBA argues that RK&K's arguments are either without merit or must be decided by an arbitrator, not the court.

On a motion to dismiss and to compel arbitration pursuant to Court of Chancery Rule 12(b)(1), the court must:  (i) consider whether issues of substantive arbitrability should be decided by the court or the arbitrator, and, if by the court, (2) determine which claims encompass matters of substantive arbitrability.  *Legend Natural Gas*, 2012 WL 4481303, at \*4 (citing *McLaughlin v. McCann*, 942 A.2d 616, 620–21 (Del. Ch. 2008)).  The general rule in Delaware is that courts decide questions of substantive arbitrability, unless "there is 'clear and unmistakable evidence' that the parties intended otherwise."  *James & Jackson, LLC v. Willie Gary, LLC*, 906 A.2d 76, 77 (Del. 2006) (citing *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002)).  On the other hand, issues of procedural arbitrability are presumptively matters for the arbitrator to decide.  *Id.* at 79; *Brown v. T-Ink, LLC*, 2007 WL 4302594, at \*12 (Del. Ch. Dec. 4, 2007) ("Unlike substantive arbitrability, questions of procedural arbitrability are presumptively for the arbitrator, and not the court, to decide.").  Neither party disputes that the court has jurisdiction over the question of substantive arbitrability in this case.[39]

---

[38] Compl. ¶¶ 43–65.

[39] Dkt. 25 ("Tr.") at 8:04–10.  The test to find "clear and unmistakable evidence" of intent to arbitrate issues of substantive arbitrability involves a review of whether the "contract

Substantive arbitrability has been defined as "a dispute over the scope of an arbitration provision" or matters that act as "gateway questions about the scope of an arbitration provision and its applicability to a given dispute." *Willie Gary*, 906 A.2d at 77. Substantive arbitrability has also been described as including questions of "whether an arbitration clause is valid and enforceable." *Legend Natural Gas*, 2012 WL 4481303, at *4. Accordingly, the determination of the scope and enforceability of the Dispute Resolution Provision in the Agreement are matters of substantive arbitrability that must be decided by this court. RK&K argues that all of its challenges to arbitration are issues of substantive arbitrability that the court must decide.

### B. Issues of Notice and Timeliness Are Matters of Procedural Arbitrability for the Arbitrator to Decide.

RK&K asks the court to enjoin arbitration for insufficiency of the notice or demand of intent to arbitrate.[40] RK&K argues that this is a matter of substantive arbitrability for the court to decide.[41] The court disagrees. Procedural arbitrability

---

contains '(1) an arbitration clause that generally provides for arbitration of all disputes; and (2) a reference to a set of arbitration rules that empower arbitrators to decide arbitrability, such as the American Arbitration Association ('AAA') Rules.'" *Redeemer Committee of Highland Crusader Fund v. Highland Capital Management, L.P.*, 2017 WL 713633, at *3 (Del. Ch. Feb. 23, 2017) (citing *Legend Natural Gas*, 2012 WL 4481303, at *4 (citing *Willie Gary*, 906 A.2d at 79)). In the present case, the first prong is satisfied, but the second prong is not. Accordingly, matters of substantive arbitrability are to be decided by this court.

[40] Compl. ¶¶ 40–41, 48–52.

[41] Pl.'s Ans. Br. 31.

has been described as including questions of "whether prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met, as well as allegations of waiver, delay, or a like defense to arbitrability." *Viacom Int'l Inc. v. Winshall*, 72 A.3d 78, 82 (Del. 2013); *accord CLP Toxicology, Inc. v. Casla Bio Hldgs. LLC*, 2021 WL 2588905, at *9 (Del. Ch. June 24, 2021); *see also SBC Interactive v. Corp. Media Partners*, 714 A.2d 758, 762 (Del. 1998) (stating procedural arbitrability matters include "whether the invocation of arbitration was proper or timely"); *Willie Gary*, 906 A.2d at 79 (stating procedural arbitrability matters include issues "such as waiver, or satisfaction of conditions precedent to arbitration"); *Homsey Architects, Inc. v. Nine Ninety Nine, LLC*, 2010 WL 2476298, at *4 (Del. Ch. June 14, 2010) (stating procedural arbitrability matters include "questions regarding whether parties have complied with the terms of an arbitration agreement" as well as "whether a party has provided adequate notice of its intention to arbitrate[] and . . . statute of limitations defenses"). Accordingly, the defense asserted by RK&K of inadequacy of the notice is a matter of procedural arbitrability that the arbitrator must decide.

In addition to its claims of inadequate notice, RK&K asserts that most if not all of the DRBA's claims are time barred either by the statute of limitations or the statute of repose. In briefing and at argument, RK&K did not seriously argue that any statute of limitations question is a matter of procedural arbitrability and

14

presumptively an issue for the arbitrator.  But RK&K maintains that the statute of repose presents an issue of jurisdiction and one of substantive arbitrability for the court.[42]

As noted above, questions concerning time limits, statutes of limitations, and other conditions precedent to an obligation to arbitrate are matters of procedural arbitrability to be decided by the arbitrator.  RK&K argues that most if not all of the DRBA's claims arise from services performed and paid for more than six years before the Notice of Intent to Arbitrate was sent, and are thus untimely under the statute of repose, 10 *Del. C.* § 8127.[43]

Section 8127, sometimes referred to as the Delaware "Builder's Statute," provides a six-year limitations period on actions for damages, indemnification, or contribution for damages resulting from any deficiency in the construction of an improvement to real property or the design, planning, supervision, or observation of any such construction.  10 *Del. C.* § 8127; *City of Dover v. Int'l Tel. & Tel. Corp.*, 514 A.2d 1086 (Del. 1986); *Becker v. Hamada,* 455 A.2d 353, 354 (Del. 1982).  The limitations period begins to run at the earliest of several designated dates, irrespective of the date of the injury.  "[A]fter the expiration of six years, no cause of action shall arise for damages resulting from deficiencies in the

---

[42] *Id.* at 13–14.

[43] *Id.* at 14–15.

construction of an improvement to real property." *Cheswold Volunteer Fire Co. v. Lambertson Const. Co.*, 489 A.2d 413, 415 (Del. 1984).

Under Section 8127, the start of the six-year repose period is triggered by the earliest of the enumerated events in Subsection (b). RK&K contends that the following two applicable triggers act to bar the DRBA's claims: Subsection (b) d, "the date when payment in full has been received . . . for the particular phase of . . . designing"; and Subsection (b) e, "the date the person against whom the action is brought has received final payment in full, under the contract for the . . . designing." *See* 10 *Del. C.* § 8127(b) d & e.

RK&K maintains that its timeliness defense under Section 8127 is a matter of substantive arbitrability for the court to decide. RK&K concentrates its argument on a line of Delaware cases that characterize statutes of repose, including Section 8127, as jurisdictional, inherently substantive, and distinct from statutes of limitations. *See e.g.*, *City of Dover*, 514 A.2d at 1089 ("The statute in question is a true statute of repose. It prevents a claim from arising, whereas a statute of limitations bars an accrued cause of action."); *Cheswold*, 489 A.2d at 420 ("the passing of the six-year period deprives the injured party of a legal right to redress"); *Caudill Rowlett Scott v. Delaware Tech. & Cmty Coll.*, 1985 WL 22033, at *2 (Del. Ch. Sept. 25, 1985) ("The statute of limitation is . . . a procedural mechanism, which may be waived. On the other hand, the statute of repose is a substantive provision

16

which may not be waived because the time limit expressly qualifies the right which the statute creates." (quoting *Cheswold*, 489 A.2d at 421)).

The question before the court, however, is not whether Section 8127 is substantive in nature, but whether RK&K's defense is one for the court or the arbitrator in the first instance. Likewise, when considering substantive arbitrability matters, the court is prohibited from considering any aspect of the merits of the claim to be arbitrated. *SBC Interactive*, 714 A.2d at 761 ("Courts may not consider any aspect of the merits of the claim sought to be arbitrated, no matter how frivolous they appear.").

In the present case, RK&K asserts the time bar under Section 8127 as a defense against the DRBA's claims. Thus, determining whether Section 8127 applies to bar any of the DRBA's claims would require the court to engage in factual determinations as to its applicability.[44]  RK&K's argument that Section 8127

---

[44] For example, RK&K's statute of repose defense turns on whether it (1) received payment in full for the design phase of its services or (2) payment in full under the Agreement more than six years before the DRBA delivered its arbitration notice to RK&K. The Agreement provided for an expiration of date of November 15, 2015, and the DRBA sent its Notice of Intent to Arbitrate to RK&K's counsel in May 2020, well within the six-year period under Section 8127. RK&K argues, however, that it received final payment by the end of 2013, even though RK&K admits it received payments for invoices that expressly referenced the agreement after that date. And the record reflects one invoice in August 2015 that references the Agreement by contract number and indicates it is for "DRBA Phase IV Design" for services from September 5, 2014 through August 14, 2015. Peters Aff., Ex. D at 144. RK&K does not dispute that it was paid for that invoice. Thus at least one payment was made in August 2015.

17

precludes the DRBA from bringing certain claims against RK&K within a certain time period is, at its core, an argument that a condition precedent to arbitration has not been met. Under Delaware jurisprudence, such procedural questions are for the arbitrator. *See Orix LF v. Inscap Asset Mgm't, LLC*, 2010 WL 1463404, at *1 (Del. Ch. Apr. 13, 2010) ("Delaware courts consider the satisfaction of conditions precedent, such as the consent purportedly required here, to be issues of procedural arbitrability.").

Delaware courts have not directly addressed whether the potential applicability of the statue of repose to a claim is a matter of substantive or procedural arbitrability. The Delaware Supreme Court's denomination of the statute of repose as a substantive right does not answer the question. As the Delaware Supreme Court recently confirmed: "Procedural arbitrability issues include 'whether prerequisites such as time limits, notice, laches, estoppel, and other conditions precedent to an obligation to arbitrate have been met, as well as allegations of waiver, delay, or a like defense to arbitrability.'" *CLP Toxicology, Inc.*, 2021 WL 2588905, at *9 (quoting *Viacom Int'l*, 72 A.3d at 82). In my view, it would seem that the facts and circumstances necessary to determine the applicability of a statute of repose is closely related to a statute of limitations defense. And accepting the language of relevant caselaw that procedural arbitrability includes issues of "time limits," would

18

tend to include a statue of repose. *See CLP Toxicology, Inc.*, 2021 WL 2588905, at *9 (quoting *Viacom Int'l*, 72 A.3d at 82).

The parties were unable to find a case directly on point. In a case considering a similar question under the Federal Arbitration Act, the court in *Graham Construction Co. v. The Daniel Group, Inc.*, 2006 WL 8448849 (M.D.N.C. Sept. 29, 2006), held that, in the Fourth Circuit, questions of limitations and repose are for the arbitrator. *Id.* at *5. The court held that the question of whether a statute of repose contained in a Tennessee statute governing claims arising from construction or improvements to real property barred a claim was one for the arbitrator. The court determined that the characterization of the statute of repose as "substantive" in nature did not make the termination of its applicability one of substantive arbitrability. *Id.* at *5–6. RK&K argues that the case is inapposite because it was a federal magistrate's ruling and the matter was settled prior to a final decision from the District Court. RK&K also argues that none of the cases upon which the court relied dealt with a statute of repose. Those criticisms do not undermine *Graham*'s overall reasoning.

In general, the U.S. Supreme Court also views prerequisites such as time limits as issues presumptively for the arbitrator. In *Howsam*, 537 U.S. 79, the Supreme Court held that a six-year time limit for asserting claims under the National Association of Securities Dealers' Code of Arbitration Procedure was not a

19

"question of arbitrability," but rather a "procedural" question that should be applied by the arbitrator. *Id.* at 85. The Supreme Court reasoned that the term "'question of arbitrability' has a . . . limited scope" and refers to a narrow set of circumstances where the court is able to "avoid[] the risk of forcing parties to arbitrate a matter that they may well not have agreed to arbitrate." *Id.* at 84–85. The Supreme Court further explained that "questions which grow out of the dispute and bear on its final disposition" are outside of that scope and presumptively for the arbitrator. *Id.* Furthermore, "any doubts concerning the scope of arbitral issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or any allegation of waiver, delay, or a like defense to arbitrability." *Gulf LNG v. Eni*, 242 A.3d 575, 583 (Del. 2021) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983)).

The question of whether a demand was timely is one of the "claims, disputes and other matters in question between the DRBA and [RK&K], arising out of or in any way relating to th[e] Agreement or the performance or breach thereof."[45] The parties agreed to arbitrate such claims or disputes. The question of whether Section 8127 bars the DRBA's claims is not whether the claims are arbitrable, but whether the demand for arbitration was timely. That should be left to the arbitrator.

---

[45] Agreement art. XII § 12(a).

Further supporting this determination is RK&K's acknowledgement that "the DUAA . . . specifically requires the Court to provide the final ruling on whether claims are barred by time."[46]  For this, RK&K refers to 10 *Del. C.* § 5714(a)(5), which provides the grounds for vacating an arbitrator's decision.

Unlike the Federal Arbitration Act, the Uniform Arbitration Act, or the Revised Uniform Arbitration Act, the DUAA contemplates that an award based upon a claim that is otherwise time barred is grounds for vacatur.  Section 5714(a) of the DUAA provides, in pertinent part:

> Upon complaint or application of a party in an existing case, the Court shall vacate an award where:
> . . .
> (5) There was no valid arbitration agreement, or the agreement to arbitrate had not been complied with, or *the arbitrated claim was barred by limitation* and the party applying to vacate the award did not participate in the arbitration hearing without raising the objection.

10 *Del. C.* § 5714(a)(5) (emphasis added).[47]

The prior iteration of this provision has been the subject of debate and some confusion.  Prior to amendment in 2009, Section 5702(c) permitted a party to

---

[46] Dkt. 27, Pl.'s Supp. Br. 12.

[47] By contrast, Section 12(a)(5) of the Uniform Arbitration Act provides the following as the fifth grounds for vacating an award:

> There was no arbitration agreement and the issue was not adversely determined in proceedings under Section 2 and the party did not participate in the arbitration hearing without raising the objection; but the fact that the relief was such that it could not or would not be granted by a court of law or equity is not ground for vacating or refusing to confirm the award.

21

challenge an otherwise arbitral claim on limitations grounds either before the arbitration by way of a complaint in this court under Section 5703 or in the arbitration proceeding itself.[48]  Section 5702(c) further provided that the failure to assert the bar of limitations in a complaint seeking to enjoin arbitration "shall not preclude its assertion before the arbitrators, who may, in their sole discretion, apply or not apply the bar."  The provision then went on to state:  "Except as provided in § 5714(a)(5) such exercise of discretion by the arbitrators shall not be subject to review by a court on a complaint or on an application in an existing case to confirm, vacate, or modify the award."  Section 5714(a)(5), in turn, permitted vacatur where "the arbitrated claim was barred by limitation under §5702(c) and the issue was not adversely determined in proceedings under §5703 and the party applying to vacate the award did not participate in the arbitration hearing without raising the objection."

---

[48] Section 5702(c) provided:

> (c) Limitation of time.  If, at the time that a demand for arbitration was made or a notice of intention to arbitrate was served, the claim sought to be arbitrated would have been barred by limitation of time had it been asserted in a court of the State, a party may assert the limitation as a bar to the arbitration on complaint to the Court as provided in § 5703(b) or by way of defense in an existing case.  The failure to assert such bar through complaint shall not preclude its assertion before the arbitrators, who may, in their sole discretion, apply or not apply the bar.  Except as provided in § 5714(a)(5) such exercise of discretion by the arbitrators shall not be subject to review by a court on a complaint or on an application in an existing case to confirm, vacate or modify the award.

As Chancellor Brown observed in *W.B. Venables & Sons v. Board of Education of the Seaford School District*, 1981 WL 88263 (Del. Ch. June 15, 1981), the statutory language among the three sections of the statute was "somewhat odd." *Id.* at *4. First, he noted that Section 5714(a)(5) appeared to be unique to Delaware, as it "is not found in the Uniform Arbitration Act as adopted by any other state." *Id.* at *6. He noted that

> § 5714(a)(5) says that an award shall be vacated where the claim involved was barred under the limitation language of § 5702(c), but at the same time § 5702(c) says that where the Statute of Limitations issue is presented to the arbitrators they shall have sole discretion to apply or not apply the bar of the Statute of Limitations in making their award, and that such exercise of discretion shall not be subject to review by this Court except as provided in § 5714(a)(5).

*Id.* at *4. In trying to harmonize the statute, Chancellor Brown determined that there was nothing in the language of Section 5714(a)(5) which provided the court with any basis to review the exercise of an arbitrator's discretionary authority under Section 5702(c). Thus, "the added portion of § 5714(a)(5) which authorizes this Court to vacate an award for a violation of § 5702(c) is irreconcilable with the language of § 5702(c) which leaves the determination of a Statute of Limitations defense to the sole discretion of the arbitrators." *Id.* at *6. Later commenting on that case and the absence of a standard of review in the statute, then-Vice Chancellor Strine observed that "it seems unlikely that the General Assembly contemplated that this court would undertake a *de novo* review of the underlying issues upon a motion

23

to vacate pursuant to 10 *Del. C.* § 5714(a)(5)." *DMS Properties-First, Inc. v. P.W. Scott Assocs., Inc.*, 1999 WL 1261335, at \*5 n.9 (Del. Ch. July 19, 1999), *rev'd*, 748 A.2d 389 (Del. 2000). In reversing, the Delaware Supreme Court held that where parties proceed to arbitration but did not agree to submit to the court the question of arbitrability to arbitration "that issue was subject to an independent or *de novo* determination by the Court of Chancery when it was raised for the first time under Section 5714." 748 A.2d at 392–93. The Supreme Court, however, was not faced with and did not address the question in the context of a limitations defense.

Adding to the confusion, however, is a 2009 statutory amendment that eliminated the prior version of Section 5702(c) and removed the cross-reference of that subsection from Section 5714(a)(5). The amendment eliminated the ability of a party to assert a limitations bar in court prior to arbitration, but retained a party's right to seek to vacate an award if the arbitrated claim was barred by limitations. The amendment did not provide a standard of review for this court to apply in considering a motion to vacate an award under Section 5714(a)(5). In the synopsis of the bill, its sponsors explained, in pertinent part:

> [T]he bill updates the [DUAA] to conform to evolving standards to address inconsistencies with prevailing best practices. The bill does so by eliminating the option to seek an injunction in the Court of Chancery on the grounds that the claim sought to be arbitrated would be time-barred. A party believing that the other side's claim was time-barred would be required to present that defense to the arbitrator, along with its other defenses. *If the arbitrator rejects that defense and enters an adverse award, the party arguing that the claim was time-barred could*

24

*seek to avoid enforcement of the order by arguing that defense to the Court of Chancery in a post-arbitration proceeding.* By this means, the [DUAA] would come into conformity with prevailing practice in the nation and eliminate an inefficient and cumbersome approach to addressing limitations defenses.

H.B. 49, 145th General Assembly (2009) (Synopsis) (emphasis added).

Neither the amendment nor the synopsis provides a standard of review for this court to apply when a party seeks to vacate an arbitrator's award that rejected a limitations defense. It is, in my view, unclear what the legislature intended when it retained that portion of Section 5714(a)(5), while at the same time eliminating the right to a pre-arbitration review of a limitations defense and stating that a party could raise a limitations defense in a post-award challenge.[49]

I need not, and do not, attempt to interpret and apply the statute here. Nevertheless, the amendment, in my view, provides further support for the notion that any type of limitations defense, either laches, statute of limitations, or the Statute of Repose, are matters to be considered by the arbitrator in the first instance.[50] The scope of any review on a later motion to vacate, is for another day. In the meantime,

---

[49] The amendment's deletion of the prior version of Section 5702(c) also eliminated the underpinning of Chancellor Brown's decision in *Venables*, which was grounded in the "language of § 5702(c) which leaves the determination of a Statute of Limitations defense to the sole discretion of the arbitrators." *Venables*, 1981 WL 88263, at *4.

[50] RK&K relies on *Caudill*, 1985 WL 22033, at *3-4, where this court held that a party did not have to arbitrate claims that were barred by Section 8127. Pl.'s Ans. Br. 14. But *Caudill* was decided before the 2009 amendment to the DUAA, when parties could assert a pre-arbitration challenge to arbitration on limitations grounds.

25

the issue of whether any of the DRBA's claims are time-barred, either due to the applicable statute of limitations or the statute of repose is for the arbitrator and not this court to decide in the first instance.

**C.** **Are the DRBA's Claims Within the Scope of the Arbitration Provision?**

In Delaware, "contracting parties who provide for the arbitration of disputes in their agreements need submit to arbitration only those claims that touch on the legal rights created by their contract." *Parfi Hldg. AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 151 (Del. 2002) (holding that arbitration was not mandated for fiduciary duty claims because they "are not based on the right and obligations created by the underlying agreement that required arbitration of claims 'arising out of or in connection with' the agreement itself"). In determining if a given claim is subject to arbitration, a court must perform a two-part inquiry. The court must first (i) "determine whether the arbitration clause is broad or narrow in scope," then (ii) "apply the relevant scope of the provision to the asserted legal claim to determine whether the claim falls within the scope of the contractual provisions that require arbitration." *Id.* at 155. Public policy of Delaware favors arbitration, thus any doubt as to arbitrability is to be resolved in favor of arbitration. *SBC Interactive*, 714 A.2d at 761.

### 1. The Arbitration Provision Is Broad.

The Dispute Resolution Provision states that "[a]ll claims, disputes and other matters in question between the DRBA and the Consultant, *arising out of* or *in any way relating to* this Agreement or the performance or breach thereof . . . shall be subject to exclusive, final and binding resolution pursuant to the dispute resolution procedures set forth in Section 1.5.1 of the DRBA Standard Specifications for Road and Bridge Construction (January 1981 edition, as amended through the date of this Agreement) (the 'Specifications')."[51] It then states that the provision "is intended as a binding agreement to arbitrate under the Delaware Uniform Arbitration Act."[52] "Delaware courts have found the use of both 'arising out of' and 'relating to' language in an arbitration provision to be a broad mandate." *Orix LF, LP*, 2010 WL 1463404, at *7; *see DeLucca v. KKAT Mgmt., L.L.C.*, 2016 WL 224058, at *10 (Del. Ch. Jan. 23, 2006) (classifying "arising out of, connecting with or simply relating to" as "terms often used by lawyers when they wish to capture the broadest possible universe"); *Li v. Standard Fiber, LLC*, 2013 WL 1286202, at *2 (Del. Ch. Mar. 28, 2013) ("[n]otably, it contains a broad arbitration provision . . . 'Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration . . .'"); *The Town of Smyrna v. Kent Cty. Levy Ct.*, 2004 WL

---

[51] Agreement, art. 12(a) (emphasis added).

[52] *Id.*

27

2671745, at *2 (Del. Ch. Nov. 9, 2004) ("[T]here is no question that the arbitration clause found in the Agreement is broad, as it covers all claims 'arising out of' or 'related to' the Agreement."); *see also Fla. Chem. Co. v. Flotek Indus., Inc.*, 262 A.3d 1066, 1082–83 (Del. Ch. 2021) (discussing the broad scope of forum selection provisions that cover claims "arising from" and "relating to" an agreement). Accordingly, the use of "arising out of" and "relating to" language in the Dispute Resolution Provision indicates the parties' intent for a broad mandate for arbitration.

## 2. Do All of the DRBA's Claims Fall Within the Agreement?

Where, as here, the arbitration provision is broad, it will apply to "any issues that touch on contract rights or contract performance." *Parfi*, 817 A.2d at 155. For a claim to fall within the scope of a broad arbitration provision, it must "depend on the existence of" the agreement that contains the arbitration provision. *Id.* "In determining arbitrability, the courts are confined to ascertaining whether the dispute is one that, on its face, falls within the arbitration clause of the contract." *SBC Interactive*, 714 A.2d at 761. "The only question the Court should decide is whether the subject matter in dispute falls within an arbitration provision." *CLP Toxicology, Inc.*, 2021 WL 2588905, at *9.

RK&K does not seriously contest the broad scope of the Dispute Resolution Provision. Instead, it contends the provision is inapplicable because the Agreement expired by its terms on November 15, 2015 and was never extended in accordance

28

with Article 4.[53]  As a result, RK&K argues that all rights and obligations under the Agreement ceased to exist on that date.[54]  In the alternative, RK&K contends that discovery is necessary to determine which of the DRBA's claims are within the Dispute Resolution Provision.

RK&K acknowledges that it performed services for the DRBA after November 15, 2015.  RK&K maintains that those services were "in support of the bridge program, but outside of the Agreement."[55]  RK&K argues that any claims that arise out of its performance in connection with purchase orders after the expiration of the Agreement are not within the scope of the Dispute Resolution Provision.[56]  The DRBA disagrees and, instead, contends that the purchase orders effectively extended the contract, as evidenced in the communications between the parties regarding these purchase orders.[57]  Thus, the DRBA asserts that all of its claims arise out of or relate to the Agreement.[58]

Article 4 of the Agreement states that the Agreement "shall have a base period of five (5) years from the date of execution unless terminated or extended by the

---

[53] Pl.'s Ans. Br. 12–13.

[54] *Id.* at 19–20.

[55] Pl.'s Ans. Br. 16–17.

[56] *Id.*

[57] Def.'s Opening Br. 9–13.

[58] *Id.*

DRBA pursuant to the provisions of this Agreement."[59]  It further gave the DRBA an option to extend the Agreement for up to three additional periods of two years each.  "Any modification or extension shall be by formal written amendment executed on behalf of the DRBA by the Executive Director or his designee and by an authorized representative of [RK&K]."[60]

The question becomes whether the purportedly arbitrable claims depend on the existence of the contract containing the arbitration clause.  *Parfi*, 817 A.2d at 155.  The DRBA's Notice of Default listed ten items where RK&K had allegedly deviated from "recognized standards of engineering care and practice" in performing engineering services for the DRBA's Bridge Project.[61]  In the Notice of Default, the DRBA specifically referenced the Agreement as the source of both RK&K's obligations and the DRBA's rights.[62]  Accordingly, the sum of the DRBA's claims as asserted would, at a minimum, "touch on contract rights and contract performance" of the Agreement.

---

[59] Agreement, art. IV.

[60] *Id.*

[61] Notice of Default.

[62] The Notice of Default stated:  "According to its agreement with the DRBA, RK&K was obligated to perform all services necessary and appropriate to complete all DRBA 'on-call' Engineering Design and Construction Phase Services, and other services, statements and reports as stated in the RFP dated February 2010."  *Id.* at 4.  The Notice of Dispute further stated:  "As a direct result of the . . . material breaches of the Agreement" the DRBA is entitled to certain damages.  *Id.* at 5.

Additionally, upon review of the Agreement and communications between the parties, it is evident that the parties intended for the purchase orders to be extensions of the original Agreement. The DRBA assigned the Agreement a specific contract number: CS-09-03. In a letter from the DRBA to RK&K dated January 31, 2013, the DRBA requested a modification to the Agreement of RK&K's services beyond its original scope.[63] On March 6, 2013, the DRBA again wrote to RK&K, this time to approve RK&K's proposal to provide additional services and fees beyond the scope of the Agreement.[64] In this letter, the DRBA explained "[s]ince we are no longer in the same fiscal year when the original purchase order was issued, it can no longer be modified."[65] Accordingly, the DRBA stated that it would "issue a separate purchase order . . . which will also be linked to this contract."[66] On July 2, 2015, RK&K wrote to the DRBA to request approval of yet another extension to the scope and fees under the Agreement, stating that "the work to modify the Bridge 6 design was much more significant than originally anticipated" and that "several items of work were added."[67] RK&K closed this letter with an expression of its appreciation

---

[63] Hoppenjans Decl., Ex. A (Jan. 31, 2013 DRBA Letter to RK&K).

[64] *Id.*, Ex. B (Mar. 6, 2013 DRBA Letter to RK&K).

[65] *Id.*

[66] *Id.*

[67] *Id.*, Ex. C (July 2, 2015 RK&K Letter to the DRBA).

of the chance to "continue [its] services to the DRBA."[68] In response, the DRBA sent a letter on August 12, 2015 approving RK&K's proposal and indicating that another purchase order "has been issued and links to this contract."[69] All of these communications took place during the base term of the contract and before the stated expiration date of November 15, 2015.

In these communications, the DRBA explicitly linked the purchase orders to the Agreement by referencing the Agreement's contract number. Likewise, RK&K cross referenced the Agreement's contract number in its July 2, 2015 letter to the DRBA, thus manifesting an understanding that these purchase orders were modifications of the Agreement. In addition, RK&K's purchase orders, progress reports, and invoices, including those after November 15, 2015, referenced the Agreement and the specific contract number, and said the invoices were "for professional services for this Contract."[70] RK&K referenced no other agreement or terms. Consequently, because the DRBA's claims brought in connection with

---

[68] *Id.*

[69] *Id.*, Ex. D (Aug. 12, 2015 DRBA Letter to RK&K).

[70] *See*, *e.g.*, Peters Aff., Ex. D at RKK App. 154–55 (Dec. 7, 2015 progress report and invoice referencing Contract No. CS-09-03 and stating "We are submitting our invoice for professional services for this Contract."); *id.* at RKK App. 158–59 (Jan. 5, 2016 progress report and invoice with same references to the contract); *id.* at RKK App. 162–63 (Feb. 4, 2016 progress report and invoice with same references to the contract); Peters Aff., Ex. E at RKK App. 167–69 (Oct. 11, 2016 progress report and invoice with same references to contract); *id.* at RKK App. 171–73 (Nov. 8, 2016 progress report and invoice with same references to contract); *id.* at RKK App. 175 (Mar. 17, 2017 invoice with same references to contract).

services performed both before and after November 15, 2015 depend on the existence of the Agreement, they are within the scope of the arbitration provision.

RK&K argues that because the Agreement was not formally extended, it cannot be required to arbitrate claims after the Agreement expired. I disagree. First, the Agreement expressly provides that the Dispute Resolution Provision of the Agreement survives termination of the Agreement.[71] It further provides: "Without limitation, the obligation of [RK&K] to follow the dispute resolution procedures set forth in Section 12(a) shall remain fully enforceable following termination."[72] The Dispute Resolution Provision survived the stated expiration date of the Agreement.[73]

RK&K next argues that it is not required to arbitrate any claims that accrued after the expiration of the Agreement. This is based upon its contention that any subsequent work performed after expiration of the Agreement is governed by separate purchase orders, which are not subject to the Agreement. For this argument, RK&K relies on two decisions. First, in *Bogen Communications, Inc. v. Tri-Signal Integration, Inc.*, 2006 WL 469963 (D.N.J. Feb. 27, 2006), *aff'd*, 227 Fed. Appx.

---

[71] Agreement art. 14 § n.

[72] *Id.*

[73] In is briefing, RK&K seemed to argue that the arbitration provision only survived if one of the parties terminated the Agreement, but it would not survive if the Agreement expired under its terms. *See* Pl.'s Ans. Br. 19–21. Plaintiff abandoned that attempt to ascribe different meaning to the terms "expiration" and "termination" at oral argument. Tr. at 48:5–20.

159 (3d Cir. 2007), the parties continued their relationship beyond the termination date of their contract. *Id.* at *1–2. The contract included an arbitration provision that applied to "[a]ny controversy relating to [the] Agreement." *Id.* at *4. It also provided that the agreement may be renewed only in a writing signed by both parties. There was no such writing. More than two years after the expiration of the contract, Bogen notified that it was terminating their relationship. Tri-Signal then filed claims against Bogen for conduct occurring after the stated expiration date of the contract. Tri-Signal asserted claims for breach of an implied-in-fact contract, but not breach of the original contract. None of Tri-Signal's claims referenced the agreement. The district court held, and the Third Circuit affirmed, that the fact that the parties continued their business relationship did not mean that the same rights and obligations under the expired contract existed.

In *Vantage, Technologies Knowledge Assessment, LLC v. College Entrance Examination Board*, 591 F. Supp. 2d 768 (E.D. Pa. 2008), the plaintiff continued to perform services after the expiration of the agreement, but had expressly rejected the defendant's draft agreements containing the same arbitration clause as the expired contract. Instead, the plaintiff sent a letter expressing its intention to continue providing services on a day-to-day basis. The letter included certain other terms, not including arbitration, and stated that "there are no further understandings." *Id.* at 769. The plaintiff continued providing services and rejected yet another draft

34

agreement with an arbitration clause three years later. Then, after another three years, the parties entered into a new contract, which did not include an arbitration provision. When a dispute arose as to claims arising after the expiration of the original contract, the court held that the claims were not subject to arbitration. The court, relying on *Bogen*, held that a party was not required to arbitrate claims arising after the expiration of a contract. *Id.* at 771. The court relied on two key facts. First, the original agreement required any renewal or modification to be accomplished through a writing signed by both parties, which did not occur. Second, the most recent contract signed by the parties did not contain an arbitration provision. *Id.* at 771.

*Bogen* and *Vantage* are distinguishable from this case. First, not only did RK&K and the DRBA continue their relationship after the stated termination date in the Agreement, but the July and August 2015 letters expressly stated that the additional services and fees to be paid pursuant thereto supplemented the Agreement. RK&K's progress reports and invoices also referenced the Agreement.[74] Thus, the letters and invoices reflect the parties' intent, reduced to writing, that those services and payments were pursuant to the Agreement. Second, the arbitration and survivability clauses are extremely broad (*Bogen* appears to have

---

[74] *See* Peters Aff., Ex. D at RKK App. 154–55, 158–59, 162–63; Peters Aff., Ex. E at RKK App. 167–69, 171–73, 175.

35

had a survivability clause, but *Vantage* does not indicate that one existed in that case). Third, the continued services that RK&K provided to the DRBA related to the very same project as was contemplated in the Agreement. Thus, the services that RK&K provided to the DRBA arose out of and related to the services provided in the Agreement. The July and August 2015 letters unambiguously reflect that fact, and the parties' subsequent correspondence and RK&K's invoices all refer to the Agreement. When there is any doubt as to whether a claim is subject to arbitration, the court should defer to arbitration, including as to whether a termination date in the contract was waived. *See Ashall Homes Ltd. v. ROK Ent'mt Gp., Inc.*, 992 A.2d 1239, 1248 (Del. Ch. 2010) ("[A]t this stage—where the court is to decide whether it can exercise jurisdiction over a dispute, and not to decide the outcome itself—coming to a conclusion as to whether the . . . Agreements' termination provision was waived would be inappropriate."). In this case, I conclude that the DRBA's claims are subject to the Dispute Resolution Provision, and any doubts are resolved in favor of arbitration.

### D. The Agreement Is Not Unconscionable or Otherwise Unenforceable.

The dispute resolution procedure set forth in Article 12(a) specifies that "[t]his Agreement for dispute resolution is intended as an agreement to arbitrate pursuant to 10 *Del. C.* § 5701 *et seq.* (with the Executive Director of the DRBA as arbitrator and referee in accordance with Section 1.5.1 of the Specifications) and shall be

specifically enforceable."[75] RK&K asserts that the court should enjoin arbitration because, by designating the Executive Director of the DRBA as arbitrator, it is unenforceable.[76] Specifically, RK&K argues that the arbitration clause is invalid because it is (i) unconscionable, and (ii) the DRBA, through its Executive Director, lacks authority to act as a tribunal.[77]

### 1. The Agreement Is Not Unconscionable or Illusory.

6 *Del. C.* § 2-302(1) states:

> If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

"Unconscionability is a concept that is used sparingly." *Ketler v. PFPA, LLC*, 132 A.3d 746, 748 (Del. 2016); *see also Progressive Int'l Corp. v. E.I. Du Pont de Nemours & Co.*, 2002 WL 1558382, at *2 (Del. Ch. July 9, 2002) ("The doctrine of unconscionability is sparingly used in the law . . . ."). To find unconscionability, the court must find both procedural and substantive unconscionability. *Chemours Co. v. DowDuPont Inc.*, 2020 WL 1527783, at *12 (Del. Ch. Mar. 30, 2020). When there is more of one, the court requires less of the other. *Id.* (citing *James v. Nat'l*

---

[75] Agreement, art. 12 § a.

[76] Pl.'s Ans. Br. 23–24.

[77] Compl. ¶¶ 43–65.

*Fin., LLC*, 132 A.3d 799, 815 (Del. Ch. 2016)). When analyzing procedural unconscionability, the court will "examine[] the procedures that led to the contract with the goal of evaluating whether seemingly lopsided terms might have resulted from arms'-length bargaining, and courts focus on the relative bargaining strength of the parties and whether the weaker party could make a meaningful choice." *Id.* (internal quotations omitted). Substantive unconscionability requires a finding of "terms evidenc[ing] a gross imbalance that 'shocks the conscience' or if the bargain is on terms so extreme as to appear unconscionable according to the mores and business practices of the time and place." *Id.* (internal quotations omitted).

RK&K argues that the Dispute Resolution Provision is unconscionable because: (1) there is "no room for negotiation on the terms;" (2) it "[f]ail[s] the business-practices-of-the-community test;" and (3) it "is grossly imbalanced."[78] These arguments are unpersuasive. RK&K fails to show that its lack of ability to negotiate is sufficient to prove procedural unconscionability. In *Zero Lamotte St., LLC v. Delaware River & Bay Authority*, 2012 WL 1415637 (Del. Super. Feb. 21, 2012), the Superior Court dealt with a similar arbitration clause contained in a different DRBA contract and specifically rejected the argument that the agreement was unconscionable and unenforceable. *Id.* at *1. In an order denying reargument, the court held that the contract was not an adhesion contract, but rather "a

---

[78] Pl.'s Ans. Br. 23–24.

38

government contract, let through a formal bid process, starting with a RFP." *Id.* The court found that the take-it-or-leave-it nature of the process was not unconscionable, reasoning that "[i]f the Plaintiff did not like [the DRBA's] RFP, it did not have to submit a bid." *Id.* Here, RK&K similarly could have refrained from submitting a bid if it found the terms of the agreement unacceptable. Accordingly, a showing of lack of negotiating opportunity alone does not demonstrate procedural unconscionability.

RK&K also contends that the Dispute Resolution Provision is unconscionable because it fails the "business-practices-of-the-community" test. RK&K finds issue with the Agreement's designation of the DRBA Executive Director as the arbitrator.[79] The "business-practices-of-the-community" test is a means of evaluating substantive unconscionability. *See Tulowitzki v. Atlantic Richfield Co.*, 396 A.2d 956, 960 (Del. 1978). The test "asks whether the terms are so extreme as to appear unconscionable according to the mores and business practices of the time and place." *Id.* Under this test, the court will look to see if the terms of the contract were "atypical in the local business community." *Id.*

In the instant case, during the bidding process, four other contractors submitted proposals to the Project under the same terms upon which RK&K ultimately agreed. There is no allegation that any of those bidders objected to the

---

[79] *Id.* at 24.

39

arbitration provision or conditioned their bids on modification of the Dispute Resolution Provision.[80] These facts undermine RK&K's position that the Dispute Resolution Provision is unreasonable in the eyes of the relevant business community at the time that the contract was made.

RK&K next asserts that an amendment made to the dispute resolution procedure in the DBRA's Standard Specifications for Road and Bridge Construction in 2014 ("Resolution 14-44") that modified the Executive Director's role as arbitrator proves that the provision must fail the "business-practices-of-the-community" test.[81] Resolution 14-44 modified the Executive Director's previous role as final decision-maker to now being "the initial decision-maker in an alternative dispute resolution process with the final binding resolution being made through an independent arbitration pursuant to the Construction Industry Arbitration Rules of the American Arbitration Association."[82] That amendment does not render the earlier standard contract terms unconscionable. "Whether a contract is unconscionable is determined at the time it was made." *James*, 132 A.3d at 814 (citing *Lecates v. Hertich Pontiac Buick Co.*, 515 A.2d 163, 173 (Del. Super. 1986)). The amendment to the DRBA's dispute resolution procedures, made subsequent to

---

[80] Dkt. 18, Def.'s Reply Br. 19.

[81] Pl.'s Ans. Br. 23–24.

[82] Compl., Ex. B (Resolution 14-44 and accompanying Meeting Minutes).

the Agreement, is not an admission that the terms of the Agreement between RK&K and the DRBA were unconscionable at the time it was made. RK&K incorrectly characterizes the DRBA's stated reasoning for adopting Resolution 14-44 as admitting that the previous procedure was "commercially unreasonable."[83] Instead, the DRBA stated that the amended version provided for "*more* commercially reasonable terms," which, the DRBA reasonably asserts, was meant to attract more contract submissions.[84] Notably, the DRBA further amended its standards in Resolution 14-44 to reduce the amount required for a bid guaranty as an additional effort to attract more bidders.[85] Thus, RK&K fails to demonstrate that the arbitration provision was commercial unreasonable at the time the Agreement was made.

RK&K argues that the Executive Director's appointment as arbitrator constitutes a gross imbalance of the terms of the Agreement.[86] The fact that the

---

[83] Compl. ¶ 18 ("DRBA had passed Resolution 14-44 amending the Standard Specifications for Road and Bridge Construction (January 1981) because the DRBA found the old terms related to dispute resolution outdated and to be 'commercially unreasonable.'").

[84] Compl., Ex. B ("The Authority desires to amend and revise its Standard Specifications for Road and Bridge Construction to incorporate advances in engineering and construction technology. . . . The Authority desires to have *more* commercially reasonable terms, and therefore, has made the Executive Director the initial decision-maker in an alternative dispute resolution proceed with the final binding resolution being made through an independent arbitration pursuant to the Construction Industry Arbitration Rules of the American Arbitration Association.") (emphasis added); *see* Def.'s Op. Br. 16.

[85] Compl., Ex. B.

[86] Pl.'s Ans. Br. 24.

41

chosen arbitrator may be an employee of one of the parties is not sufficient to show unconscionability. Delaware courts have previously enforced this exact arbitration provision with the Executive Director designated as the arbitrator. *See Mendelson v. Delaware River & Bay Auth.*, 112 F.Supp.2d 386 (D. Del. 2000); *Ruckman & Hansen, Inc. v. Delaware River & Bay Auth.*, 244 A.2d 277 (Del. 1968). In *Mendelson*, the U.S. District Court for the District of Delaware similarly addressed a challenge to the arbitration provision's unenforceability on grounds of impartiality due to the arbitrator being the Executive Director of the DRBA. *Mendelson*, 112 F.Supp.2d at 397. The court found that the objecting party "was fully aware of this language when it entered into the agreement." *Id.* The court held that the objecting party could not subsequently "renege on this part of the bargain" and the arbitration clause remained valid and enforceable. *Id.* at 397–98. In *Ruckman*, 244 A.2d 277, the court similarly held that the decision of the arbitrator, in that case the Director of the DRBA, was binding in the absence of fraud, despite his being an employee of the DRBA. *Id.* at 277–78.[87]

---

[87] In *Kuhn Construction, Inc. v. Diamond State Port Corp.*, 990 A.2d 393 (Del. 2010), the court called into question whether the language in the contract at issue in *Ruckman* "constituted an arbitration provision." *Id*. at 396. The Court held the "referee clause" at issue in *Ruckman* did not "unequivocally serve[] as an arbitration clause, with the State's employee acting as an 'impartial' arbitrator or referee." *Id*. at 397. In both *Kuhn* and *Ruckman*, the dispute resolution clause did not contain the word "arbitrate." In this case, however, the Dispute Resolution Provision expressly states that it "is intended as a binding agreement to arbitrate under the [DUAA]." Agreement § 12(a). Thus, the grounds for the Court's concerns in *Kuhn* are not applicable here.

In addition, in *Wilson Contracting Co. v. State*, 243 A.2d 65 (Del. Super. 1965), *aff'd*, 224 A.2d 396 (Del. 1966), the Delaware Superior Court analyzed an arbitration provision identical to Section 1.5.1, wherein it appointed the Chief Engineer of the State Highway Commission as arbitrator. *Id.* at 66. The *Wilson* Court held that "so long as the decisions made were not arbitrary, capricious, fraudulent or so grossly erroneous or partial as to impeach the arbitrator's good faith and constitute constructive fraud, they are final." *Id.* at 67. The court further stated that "[a]n exercise of honest judgment is all that is required, and this is true even though the referee or arbitrator is within the employ of one of the parties, as this fact was clearly known at the time of selection and the parties are bound by their agreement." *Id.* Ultimately, Delaware law provides for a "statutory safeguard . . . sufficient to insure that an arbitration under the policy will be fair to both parties." *Graham v. State Farm Mut. Auto. Ins. Co.*, 565 A.2d 908, 911 (Del. 1989) (citing 10 Del. C. § 5714).

Both RK&K and the DRBA were sophisticated parties, and there is no dispute that both were fully aware of the Dispute Resolution Provision when entering into the Agreement. While the DRBA may have been in a better bargaining position, "mere disparity between the bargaining power of parties to a contract will not support a finding of unconscionability." *Id.* at 912 (citing *Tulowitzki*, 396 A.2d at 960). Rather, the court must find that the party with the superior bargaining power

43

used this disparity to take advantage of the weaker party, resulting in terms being "so one-sided as to be oppressive." *Id.* Here, in light of the foregoing precedents, RK&K is unable to demonstrate that the terms are so unreasonable or that "the terms of the agreement bear no reasonable relation to the business risks involved and are so one-sided as to be oppressive." *Tulowitzki*, 396 A.2d at 962. Accordingly, I reject RK&K's contention that the Agreement is unconscionable.

## 2. The DRBA Has the Statutory Authority to Act as Arbitrator.

RK&K argues that the DRBA lacks statutory authority to act, through its Executive Director, as the arbitrator. I disagree. The Compact creating the DRBA imparted broad jurisdictional authority to the agency and broad means in carrying out that authority.[88] The Compact states that the DRBA "shall constitute an agency of government for the State of Delaware and the State of New Jersey . . . and which shall be deemed to be exercising essential government functions in effectuating such purposes" including the

> planning, financing, development, construction, purchase, lease, maintenance, improvement, and operation of crossings between the States of Delaware and New Jersey across the Delaware River or Bay . . . together with such approaches or connections thereto as in the judgment of the Authority are required to make adequate and efficient connections between such crossings and any public highway or other routes in the State of Delaware or in the State of New Jersey.[89]

---

[88] Grzaslewicz Decl., Ex. C (DRBA Compact, as amended 1990).

[89] *Id.*, art. IV.

44

The Compact, "[f]or the effectuation of its authorized purposes," grants the DRBA the authority to "adopt rules and regulations and [] make appropriate orders to carry out and discharge its powers, duties, and functions" and "[t]o enter into contracts and agreements with . . . any individual, firm, or corporation deemed necessary or advisable for the exercise of its purposes and powers."[90]  Additionally, the Compact broadly grants the DRBA the ability

> [t]o exercise all other powers not inconsistent with the Constitutions of the two States or of the United States, which may be reasonably necessary or incidental to the effectuation of its authorized purposes or to the exercise of any of the foregoing powers . . . and generally to exercise in connection with its property and affairs, and in connection with property within its control, any and all powers which might be exercised by a natural person or a private corporation in connection with similar property and affairs.[91]

Ultimately, the final decision from arbitration remains judicially reviewable under 10 *Del. C.* § 5714.  Thus the DRBA is still subject to the jurisdictional authority of both states.  Accordingly, the arbitration agreement is valid and enforceable and any claims "arising under the terms of the Contract between the parties hereto" are subject to mandatory arbitration with the Executive Director acting as arbitrator.[92]

---

[90] *Id.*, art. VII.

[91] *Id.*, art. VII § o.

[92] Agreement, art. 12 § a.

## III.  CONCLUSION

For the foregoing reasons, the DRBA's Motion to Compel Arbitration and to Dismiss is **GRANTED**.